IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSHUA TEAGUE, )
)
Plaintiff, )
)
v. )
)
HEALTHCARE DEVELOPMENT )
PARTNERS, LLC, and TODD BRYANT,)
individually and as agent of )
HEALTHCARE DEVELOPMENT )
PARTNERS, LLC, )
)
Defendants. )

## COMPLAINT AT LAW

NOW COMES Plaintiff, JOSHUA TEAGUE, by and through his attorneys, and hereby complains against Defendants, HEALTHCARE DEVELOPMENT PARTNERS, LLC, and TODD BRYANT, individually and as agent of HEALTHCARE DEVELOPMENT PARTNERS, LLC, as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff is an individual residing in Charlotte, North Carolina who was employed by Defendants from July 3, 2015 through October 13, 2017.

2.      Defendant Healthcare Development Partners, LLC, (hereinafter "HDP"), is an Illinois limited liability company engaged in the business of real estate development and property management, which operates its business throughout the United States with its principal place of business in Illinois.

3.      Defendant Todd Bryant, (hereinafter "Bryant"), is the Managing Member of and an officer and agent of HDP and residing in Cook County, Illinois.

4.     Federal diversity jurisdiction is invoked because the parties are domiciled in different states and the amount in dispute exceeds Seventy Five Thousand Dollars ($75,000.00).

5.     The parties have consented to venue in the Northern District of Illinois by virtue of Paragraphs 19 and 24 of the Employment Agreement, which provide that any claim or dispute must be filed exclusively in state or federal court in Cook County, Illinois.  Exhibit A. [1]

### COUNT I – BREACH OF CONTRACT

1-5.     Plaintiff restates and reiterates each and every allegation set forth in Paragraphs 1 through 5 above as the fully set forth herein.

6.      On or about July 3, 2015, Plaintiff entered into an Employment Agreement with Defendant HDP, setting forth, *inter alia*, his wages, incentive compensation and other terms and conditions of his employment with Defendant.  Ex. A.

7.     Defendant Bryant executed the aforementioned Employment Agreement on behalf of Defendant HDP.  Id.

8.     Pursuant to Section 7(b) of the Employment Agreement, Plaintiff was entitled to receive an annual base salary of One Hundred and Forty Five Thousand Dollars ($145,000.00). Id.

9.     Pursuant to Section 7(c) of the Employment Agreement, Plaintiff was entitled to receive annual incentive compensation in the form of an annual bonus equivalent to Twenty Percent (20%) of Plaintiff's base salary, payable on the first pay day of April each year.  Id.

10.     In April, 2016, Defendant Bryant promised Plaintiff a Forty Percent (40%) annual bonus for the 2015-2016 fiscal year in the amount of Fifty-Eight Thousand Dollars ($58,000.00).

---

[1] Plaintiff notes that Proteus Group, LLC ("Proteus") is also party to the Employment Agreement as one of Plaintiff's employers, and that Frank Talbert executed the Agreement on behalf of Proteus.  However, Proteus and Talbert are not named as Defendants in this case because Proteus was involuntarily dissolved on or about January 12, 2018, and Talbert previously was discharged in personal bankruptcy.

11.     Pursuant to Section 7(f) of the Employment Agreement, Plaintiff was entitled to full reimbursement for all reasonable out-of-pocket business expenses incurred by him on behalf of Defendants.  Id.

12.     Pursuant to Section 9 of the Employment Agreement, Plaintiff was entitled to receive a "Promoted Interest" ownership stake in the Sierra Bloom project in Phoenix, Arizona, as well as other projects in which Plaintiff provided a direct managerial role.  Id.

13.     On or about May 27, 2017, Defendant Bryant promised Plaintiff with a Five Percent (5%) ownership stake in the Sierra Bloom project in accordance with Section 9 of the Employment Agreement.  Exhibit B, attached hereto.

14.     The net present value ("NPV") of Plaintiff's 5% ownership stake in Sierra Bloom is currently valued at approximately One Million Eight Hundred and Seventy-One Thousand Dollars ($1,871,000.00) based on conservative estimates.

15.     In or around January, 2016, Defendant Bryant promised Plaintiff a Ten Percent (10%) ownership stake in the Winchester project in Winchester, Virginia in accordance with Section 9 of the Employment Agreement.

16.     The NPV of Plaintiff's 10% ownership stake in the Winchester project is currently valued at approximately Four Hundred Thousand Dollars ($400,000.00) based on conservative estimates.

17.     Plaintiff fully and satisfactorily performed each and every promise, duty, and obligation expected of him under the Employment Agreement.

18.     Defendants have accepted and enjoyed the benefits of Plaintiff's full and satisfactory performance of his contractual obligations.

3

19.     From August 16, 2017 through October 13, 2017, Defendants failed and/or refused to pay Plaintiff portions of his contractual wages under Section 7(b) of the Employment Agreement totaling Seventeen Thousand Eight Hundred and Thirty Nine Dollars and Forty Seven Cents ($17,839.47) in unpaid wages.

20.     In April, 2016, Defendants failed and/or refused to pay Plaintiff his annual incentive bonus under Section 7(c) of the Employment Agreement for fiscal year 2015-2016 totaling Fifty Eight Thousand Dollars ($58,000.00) in unpaid incentive compensation.

21.     In April, 2017, Defendants again failed and/or refused to pay Plaintiff his annual incentive bonus under Section 7(c) of the Employment Agreement for fiscal year 2016-2017 totaling Twenty Nine Thousand Dollars ($29,000.00) in unpaid incentive compensation.

22.     To date, Defendants have failed and/or refused to pay Plaintiff his pro-rata share of his annual incentive bonus under Section 7(c) of the Employment Agreement for fiscal year 2017-2018 totaling Fifteen Thousand Four Hundred and Fifty Six Dollars ($15,456.00) in unpaid incentive compensation.

23.     To date, Defendants have failed and/or refused to reimburse Plaintiff for his reasonable out-of-pocket business expenses incurred on behalf of Defendants under Section 7(f) of the Employment Agreement totaling in excess of Four Thousand Dollars ($4,000.00) in unreimbursed out-of-pocket expenses.

24.     By virtue of the aforementioned failures/refusals by Defendants to provide Plaintiff with his contractual wages, bonuses and other compensation, Defendants are in breach of the Employment Agreement.

25. On October 6, 2017, Plaintiff sent a detailed letter to Defendant Bryant outlining Defendants' myriad contractual breaches and underpayments in an effort to collect what he is contractually owed. Exhibit C, attached hereto.

26. Almost immediately thereafter, Defendant Bryant responded to Plaintiff's letter via e-mail stating, "You just fucked your self." (sic). Exhibit D, attached hereto.

27. One week later, by letter dated October 13, 2017, Defendant Bryant terminated Plaintiff's employment with HDP. Exhibit E, attached hereto.

28. Plaintiff has made several subsequent requests to collect what he is contractually owed by Defendants.

29. Despite Plaintiff's repeated requests for payment, Defendants have continued to refuse to pay any part of what is due and owing to Plaintiff.

30. By virtue of the foregoing, Defendants have failed or refused to perform their promises, duties and obligations under the Employment Agreement, which has caused and will continue to cause Plaintiff to suffer damages in excess of Two Million Dollars ($2,000,000.00).

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in his favor and against Defendants, jointly and severally, and award Plaintiff damages in a sum of not less than Two Million Dollars ($2,000,000.00), with the actual amount to be determined at trial, together with pre- and post-judgment interest, costs, disbursements, and reasonable attorney's fees, and for such other and further relief as the Court may deem just and proper under the circumstances.

## COUNT II – UNJUST ENRICHMENT

1-30. Plaintiff restates and reiterates each and every allegation contained in Paragraphs 1 through 30 above as though fully set forth herein.

31.     From July 3, 2015 through October 13, 2017, Plaintiff provided labor and services to Defendants pursuant to the Employment Agreement.

32.     Plaintiff's labor and services have provided a benefit to and have enriched Defendants.

33.     Defendants accepted the benefits of Plaintiff's labor and services.

34.     Defendants failed and/or refused to compensate Plaintiff for his labor and services pursuant to the terms of the Employment Agreement.

35.     Defendants' retention of the benefits of Plaintiff's labor and services without compensation violates the fundamental principles of justice, equity and good conscience, and has unjustly enriched Defendants.

36.     In the alternative to Count I, Defendants are liable to Plaintiff for the value of Plaintiff's labor and services provided under the Employment Agreement.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in his favor and against Defendants, jointly and severally, and award Plaintiff damages in a sum not less than Two Million Dollars ($2,000,000.00), with the actual amount to be determined at trial, together with pre- and post-judgment interest, reasonable attorney's fees, costs and disbursements, and for such other and further relief as the Court may deem just and proper under the circumstances.

## COUNT III – FRAUDULENT MISREPRESENTATION

1-36.     Plaintiff restates and reiterates each and every allegation contained in Paragraphs 1 through 36 above as the fully set forth herein.

37.     Defendants made false statements of material fact to Plaintiff regarding the terms and conditions of his employment including, but not limited to, his annual wages under Section 7(b) of the Employment Agreement; his annual incentive bonuses under Section 7(c) of the

Employment Agreement; and his entitlement to be reimbursed for out-of-pocket business expenses under Section 7(f) of the Employment Agreement.

38.     Defendants made further false statements of material fact to Plaintiff including promises of 5% ownership stake in the Sierra Bloom project and 10% ownership stake in the Winchester project.

39.     Defendants made the aforementioned false statements of material fact to Plaintiff with the intent to induce Plaintiff to work for Defendants.

40.     Plaintiff reasonably and justifiably relied on Defendants' false promises to his detriment.

41.     By virtue of Defendants' knowingly false misrepresentations, Plaintiff has been caused to suffer damages in an amount of not less than Two Million Dollars ($2,000,000.00).

WHEREFORE Plaintiff prays that this Honorable Court enter judgment in his favor and against Defendants, jointly and severally, and award Plaintiff damages in a sum not less than Two Million Dollars ($2,000,000.00), with the actual amount to be determined at trial, together with pre- and post-judgment interest, reasonable attorney's fees, costs and disbursements, and for such other and further relief as the Court may deem just and proper under the circumstances.

### COUNT IV – WAGE PAYMENT AND COLLECTION ACT

1-41.   Plaintiff restates and reiterates each and every allegation contained in Paragraphs 1 through 41 above as the fully set forth herein.

42.     At all times relevant hereto, Plaintiff was an "employee" of each of the Defendants within the meaning of the Illinois Wage Payment and Collection Act ("IWPCA" or "the Act"). 820 ILCS § 115/1 *et. seq.*

7

43. At all times relevant hereto, each of the Defendants constituted Plaintiff's "employer" within the meaning of the IWPCA. 820 ILCS § 115/2.

44. At all times relevant hereto, Defendant Bryant was an "officer" and "agent" of Defendant HDP within the meaning of Section 13 of the Act. 820 ILCS § 115/13.

45. Defendant Bryant knowingly permitted Defendant HDP to fail and/or refuse to pay Plaintiff his contractual wages and other compensation.

46. By virtue of the aforementioned failure and/or refusal by Defendants to fully compensate Plaintiff under the terms of the Employment Agreement, Defendants are each liable to Plaintiff for unpaid wages, bonuses and other compensation in excess of Two Million Dollars ($2,000,000.00), plus statutory punitive damages in the amount of two percent (2%) per month of the amount of unpaid wages and other compensation, plus costs, expenses and reasonable attorneys' fees pursuant to the IWPCA. 820 ILCS § 115/13; 820 ILCS § 115/14.

WHEREFORE, Plaintiff prays that this Honorable Court enter Judgment in his favor and against the Defendants, jointly and severally, and award Plaintiff damages in a sum of not less than Two Million Dollars ($2,000,000.00) with the actual amount to be determined at trial, plus punitive damages in the amount of two percent (2%) per month of the amount of unpaid wages and other compensation, together with pre- and post-judgment interest, costs, disbursements, and reasonable attorneys' fees, and for such other and further relief as the Court may deem just and proper under the circumstances.

## COUNT V – DECLARATORY JUDGMENT

1-46. Plaintiff restates and reiterates each and every allegation contained in Paragraphs 1 through 46 above as though fully set forth herein.

8

47. On October 6, 2017, Plaintiff sent a detailed letter to Defendant Bryant outlining Defendants' myriad contractual breaches and underpayments. Ex. C.

48. Bryant responded to Plaintiff's letter via e-mail stating, "You just fucked your self." Ex. D.

49. One week later, by letter dated October 13, 2017, Defendants terminated Plaintiff's employment, allegedly for "cause." Ex. E.

50. Section 12 of the Employment Agreement, entitled "Nonsolicitation and Noncompetition" defines the term "cause" as it relates to that Agreement. See Ex. A, p. 6.

51. By letter dated November 2, 2017, Plaintiff, through his attorneys, demanded an explanation for the sudden termination of his employment, and further demanded a full accounting of any monetary losses allegedly incurred by Defendants as a result of any alleged act or omission by Plaintiff. Ex. F.

52. To date, Defendants have failed to identify any act or omission by Plaintiff which could possibly constitute "cause" as that term is defined under Section 12 of the Employment Agreement.

53. To date, Defendants have failed to identify any monetary or other losses that could possibly be attributed to any alleged act or omission of the Plaintiff.

54. Accordingly, Plaintiff's employment was not terminated for cause.

55. Section 12 of the Employment Agreement, entitled "Nonsolicitation and Noncompetition" applies and is enforceable against Plaintiff only if Defendants terminate Plaintiff's employment for "cause" or if Plaintiff resigns for any reason. Ex. A, p. 6.

56. Because of Defendants' numerous breaches of the Employment Agreement set forth above, and because Defendants did not terminate Plaintiff's employment for "cause," and

because Plaintiff did not resign from his employment with Defendants, the "Nonsolicitation and Noncompetition" provisions of Section 12 of the Employment Agreement are null and void and unenforceable against Plaintiff.

WHEREFORE, Plaintiff prays that this Honorable Court enter Declaratory Judgment in his favor and against Defendants declaring that the Non-solicitation and Non-competition provisions of Section 12 of the Employment Agreement are null and void and unenforceable against Plaintiff, and fully release Plaintiff from any pre- and post-termination duties or obligations contained in the Employment Agreement, award Plaintiff his costs, disbursements, and reasonable attorneys' fees, and for such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all Counts.

Respectfully Submitted,

by, _____
Joshua M. File, an attorney for Plaintiff

Stanley Eisenstein
Joshua M. File
KATZ, FRIEDMAN, EAGLE, EISENSTEIN, JOHNSON & BARECK, P.C.
77 West Washington Street, 20th Floor
Chicago, IL 60602
Ph: (312) 263-6330
Fx: (312) 372-5555
seisenstein@kfeej.com
jfile@kfeej.com

# EXHIBIT A



## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is entered into July 3, 2015, by and among Illinois limited liability companies, the Proteus Group, LLC and Healthcare Development Partners, LLC (hereinafter referred to collectively as the "Company"), and Joshua A. Teague ("Employee").

### AGREEMENT

1) **Definitions.** The following definitions apply to this Agreement:

   a) "Company Service" means any service, technology, product or concept that the Company has sold or marketed, or any service, technology, product or concept that the Company has investigated, studied, conceived, designed, developed (or that is under development), manufactured, or any service, technology, product or concept regarding which the Company has conducted or acquired research and development prior to or during the term of Employee's employment with the Company or for the two (2) year period before and after Employee's Separation Date, as that term is defined below.

   b) "Confidential Information" means any proprietary, confidential or competitively sensitive information and material that is the property of or relates to the Company and which derives independent economic value from not being generally known or ascertainable by proper means but which does not constitute one or more Trade Secrets, including without limitation:

      i) the identity of the Company's past, present and prospective clients, customers, suppliers or business contacts, and all documents, information and materials that concern or relate to such clients, customers, suppliers or business contacts, including the client's own Confidential Information;

      ii) organizational and operational information such as marketing information, sales information, advertising information, techniques, strategies, business plans, product development information, delivery schedules, market research, forecasts, personnel and salary data, methods of operation, financial data, statements and projections, pricing information, costs, sales, budgets, profits and merger, acquisition, expansion or divestiture information;

      iii) technical information including that relating to processes, presentation, packaging, delivery methods, quality control measures and processes, specifications, improvements, discoveries, developments, designs and other proprietary processes;

      iv) information disclosed to Employee as part of any training process; and

      v) any document marked "Confidential," or any information which Employee has been told is confidential or which Employee might reasonably expect Company would regard as confidential, or any information which has been given Company in confidence by customers, suppliers or other persons.

   c) "Competing Product/Service" means any service, technology, product or concept that is the same or similar to, competes with, may be substituted for, replaces, resembles, performs any of

the same or similar functions, is used or intended to be used for any of the same purposes as a Company Service. Competing Product/Service includes, but is not limited to, any healthcare real estate service involving development, acquisitions, architecture, and/or engineering. Competing Product/Service does not include working for a hospital or healthcare system, nor does it include consulting services (excluding development, acquisitions, architecture, and/or engineering services) provided by brokerage or corporate service/consulting organizations such as CBRE, JLL, Newmark Grubb Knight Frank, or other similar companies.

d) "Creations" means all records, documents, papers, inventions and notebooks, drawings, designs, technical information, source code, object code, processes, methods or other copyrightable or otherwise protected works, in whatever media, that the Employee has conceived, created, made, invented, or discovered relating to any work the Employee performs or has performed on behalf of the Company, or any other Confidential Information (whether or not during usual working hours), whether conceived, created, discovered, made, or invented individually or jointly with others employed or contracted on behalf of the Company.

e) "Key Employee" means any person who at the Separation Date is employed or engaged by the Company and with whom Employee has had material contact in the course of employment during the twenty-four (24) months immediately preceding the Separation Date, and (i) is an employee, manager or salesman of the Company and/or (ii) is in possession of Confidential Information and/or Trade Secrets of the Company and/or (iii) is directly managed by or reports to Employee as of the Separation Date.

f) "Restricted Customer" means any customer of the Company to which the Employee (whether individually or as part of a team), or one or more individuals or Company business units supervised, assisted, managed or directed by Employee, sells or provides products or services on behalf of the Company during the twelve (12) month period immediately preceding the Separation Date.

g) "Restricted Territory" means the one hundred (100) mile radius of Company's North Carolina location.

h) "Separation Date" means the date upon which Employee's employment with the Company is terminated.

i) "Services" means services of the type performed for the Company by Employee or one or more Company employees managed, supervised or directed by Employee during the twelve (12) months preceding the Separation Date.

j) "Strategic Customer" means a customer of the Company that purchased a product or service from the Company during the twenty-four (24) month period immediately preceding the Separation Date, but is limited to those customers with whom Employee had no direct contact but of or for whom Employee learns, knows, creates or reviews Confidential Information or Trade Secrets on behalf of the Company during the twelve (12) month period immediately preceding the Separation Date.

k) "Territory" means a county within the United States of America, the District of Columbia, a territory of the United States of America, and/or a foreign nation.

2

l) "Trade Secret" means a Trade Secret as that term is defined under Uniform Trade Secrets Act.

2) **At Will Employment.** The Employee's employment under this Agreement will commence on June 30, 2015. Employee's official report date upon which his duties and compensation will commence is anticipated to be no later than August 3, 2015. The Employee's employment under this Agreement is "at will" and may be terminated at any time, for any reason not prohibited by law, subject to the terms of this Agreement. The term of the Employee's employment under this Agreement is hereinafter referred to as the "Employment Period."

3) **Consideration.** The Company has provided Employee with valuable consideration for executing and abiding by this Agreement including, but not limited to: (i) employment with the Company; (ii) continued employment with the Company; (iii) access or continued access to Company's customer relationships, goodwill, Confidential Information or Trade Secrets; and (iv) eligibility to invest in the equity ownership on a pari passu basis as indicated below in this Agreement.

4) **Title and Reporting.** During the Employment Period, the Employee will serve as Senior Vice President, reporting directly to Todd Bryant and Frank Talbert, the owners of the Company (the term "Owners" as used herein shall also refer to any successor or assignee of Todd Bryant and Frank Talbert).

5) **Duties.** The Employee shall have such duties, authority and responsibilities as are consistent with the duties normally performed by a Senior Vice President of businesses of similar size and service. Employee's immediate duties shall include, but are not limited to: managing current development projects in and around the Charlotte, North Carolina area; assisting in and/or managing development projects in and around Arizona; and developing strategies for expansion of the Company's presence into the Carolinas and East Coast. The Employee will diligently and conscientiously perform his duties and will devote substantially all of his business hours to advancing the Company's interests. Employee will make the best use of the Employee's energy, knowledge, and training. During his employment with the Company, Employee shall not accept employment related to or constituting any Competing Product/Service. Employee also shall not accept any other employment that interferes with Employee's ability to perform his duties for the Company. The Employee will promptly cease any activity that conflicts with the Company's interests or adversely affects the performance of the Employee's duties for the Company, as reasonably determined by the Owners.

6) **Location and Travel.** During the Employment Period, the Employee will be based in Charlotte, North Carolina. In the course of performing his duties, the Employee will be required to travel periodically and will be reimbursed for reasonable travel expenses in accordance with Company policies and Section 7(f) of this Agreement.

7) **Compensation.**

   a) **Hourly Compensation.** Employee's compensation for the first 30 days of employment will be on an hourly basis at a rate of seventy dollars ($70.00) per hour. Thereafter, Employee's compensation will convert to Base Salary as hereinafter defined.

3

b) **Base Salary**. During the Employment Period, the Employee will receive an annual base salary of $145,000 annualized, subject to review from time to time and no less often than annually. The Base Salary will be payable in accordance with the Company's normal payroll practices as are in effect from time to time.

c) **Incentive Compensation**. During the Employment Period, Employee will be eligible to receive incentive compensation in the form of an annual bonus equivalent to 20% of Employee's base salary based on Employee's performance (the "Annual Bonus"). The Employee will be eligible for the Annual Bonus, to be reasonably determined by the Owners, and based on eligibility factors and criteria, which will be determined by the Employee and the Owners and attached as Schedule A to this Agreement. It is the intent of the Parties to complete Schedule A at a future date in the calendar year of 2015. Payment of the Annual Bonus is contingent upon Employee being employed by the Company on the date the Annual Bonus is paid. The Annual Bonus will be paid via lump-sum and incorporated into Employee's first paycheck in the month of April each year. Employee's performance will be measured from April to March. For performance in the year of 2015, the Annual Bonus will not be prorated. Additionally, Employee may, from time-to-time and as solely determined by the Owners, be eligible for additional incentive compensation in relation to percentages of project fees and/or the overall financial performance of the Company.

d) **Vacation**. Employee is a professional and the Company trusts Employee's judgment. As such, Employee does not have defined vacation days. The Company trusts Employee will take time away from work as Employee needs without it interfering with Employee's job performance or adversely impacting the Company's business.

e) **Benefits and Perquisites**. The Employee will be eligible for the benefits listed in Schedule B to this Agreement.

f) **Reimbursement of Business Expenses**. The Company agrees to reimburse the Employee for all reasonable out-of-pocket business expenses incurred by the Employee on behalf of the Company (including but not limited to travel, professional dues, obtainment or renewal of licenses, and client entertainment) provided that the Employee properly accounts to the Company for all such expenses in accordance with the rules and regulations of the Internal Revenue Service under the Internal Revenue Code of 1986, as amended (the "Code") and in accordance with the standard policies of the Company relating to reimbursement of business expenses incurred by its employees. The Company also agrees to reimburse the Employee for all reasonable business-related supplies, including general office supplies, laptop computer, printer, and cell phone. Reimbursement or payment of an expense under this Section 7(f) will be made or reimbursed within a reasonable time after the Company's receipt of the Employee's request for payment or reimbursement, but in no event later than December 31 of the calendar year following the calendar year in which the expense was incurred.

8) **Project Equity**. With regard to projects in which Employee provide a direct managerial role, Employee will be eligible to invest in the equity ownership on a pari passu basis. The amount of any equity investment will be mutually determined by the parties on a case-by-case basis.

9) **Promoted Interest**. The Parties acknowledge that the investment structure of certain projects pursued by the Company may contain a promoted interest as added incentive to the Company (the

4

"Promote"). To the extent Employee provides a direct managerial role in projects where a Promote exists, Employee will receive a percentage of the Promote within the range of 10-35% as mutually determined by the Parties on a case-by-case basis, provided, however, that Employee's percentage of any Promote related to the Sierra Bloom campus in Phoenix, Arizona is anticipated to be within the range of 5-10% as mutually determined by the Parties.

10) **Protection, Ownership and Disclosure of Trade Secrets, Confidential Information, and Creations.** During Employee's employment with the Company and after the Separation Date, Employee agrees to hold the Company's Trade Secrets, Confidential Information and any Creations, as defined above, in the strictest confidence, to the fullest extent permitted by law. To this end:

    a) Employee will not make or permit copies to be made of Trade Secrets, Confidential Information, or Creations, except as necessary to carry out Employee's duties for the Company;

    b) Employee will not disclose any Trade Secret, Confidential Information, or Creations to any person except other Company employees with a need to know the information;

    c) Employee will take all reasonable precautions to prevent the inadvertent disclosure of Trade Secrets, Confidential Information, or Creations to any unauthorized person; and

    d) Employee will acknowledge that the Company is the owner of the Company's Trade Secrets, Confidential Information, and Creations and agrees not to contest any such ownership rights of the Company, either during or after Employee's employment with the Company. The Employee irrevocably and unconditionally waives all rights that may otherwise vest in his authorship (or after the date of this Agreement) in connection with his authorship of any such copyrightable works, wherever in the world enforceable. Without limitation, the Employee waives the right to be identified as the author of any such works and the right not to have any such works subjected to derogatory treatment. The Employee recognizes any such works are "works for hire" of which the Company is the author.

11) **Disclosure of Creations to Company.** The Employee will promptly disclose, grant and assign ownership to the Company as directed by the Company, for its sole use and benefit, any and all ideas, processes, inventions, discoveries, improvements, technical information, and copyrightable works (whether patentable or not) that the Employee has developed, acquired, conceived or reduced to practice (whether or not during usual working hours) while employed by and on behalf of the Company and to which the Company has any reasonable right or interest. In connection therewith: (i) the Employee will, without charge but at the Company's expense, promptly execute and deliver such applications, assignments, descriptions and other instruments as the Company may reasonably consider necessary or proper to vest title to any such inventions, discoveries, improvements, technical information, patent applications, patents, copyrightable work or reissues thereof in the Company and to enable it to obtain and maintain the entire worldwide right and title thereto; and (ii) the Employee will provide to the Company at the Company's expense all such assistance as the Company may reasonably require in the prosecution of applications for such patents, copyrights or reissues thereof, in the prosecution or defense of interferences that may be declared involving any such applications, patents or copyrights and in any litigation in which Company may be involved relating to any such patents, inventions, discoveries, improvements, technical information or copyrightable works or reissues thereof.

5

12) **Nonsolicitation and Noncompetition.** During Employee's employment with the Company and for the length of time identified below, the following provisions will apply, if: (1) Employee is terminated for "cause" as that term is defined in this Agreement; or (2) Employee resigns for any reason.

    a) Limited Restriction on Selling a Competing Product/Service. For two (2) years beginning on the Separation Date, Employee shall not sell or solicit the sale of a Competing Product/Service to a Restricted Customer.

    b) Limited Restriction on Assisting Competition. For two (2) years beginning on the Separation Date, Employee shall not perform Services as part of or in support of providing, selling or soliciting the sale of a Competing Product/Service to a Restricted Customer.

    c) Limited Restriction on Misuse of Information. For two (2) years beginning on the Separation Date, Employee shall not sell or solicit the sale of a Competing Product/Service to a Strategic Customer.

    d) Limited Restriction on Assisting Misuse of Information. For two (2) years beginning on the Separation Date, Employee shall not perform Services as part of or in support of providing, selling or soliciting the sale of a Competing Product/Service to a Strategic Customer.

    e) Limited Territorial Restriction. For two (2) years following the Separation Date, Employee shall not perform Services as part of or in support of the business of selling, soliciting the sale of, or providing Competing Product/Service in the Restricted Territory.

    f) Non-solicitation of Key Employees. During employment with the Company and for two (2) years beginning on the Separation Date, Employee shall not, solicit a Key Employee to terminate employment with the Company. This shall not bar any employee of the Company from applying for or accepting employment with any person or entity.

For purposes of this Section 14, "cause" means: (i) conviction of, or a plea of no contest or *nolo contendre* to, a felony or a crime of moral turpitude; (ii) an act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of Employee's employment with Company; (iii) intentional disclosure of Company's Confidential Information; (iv) engaging in any Competing Product/Service; (v) breach of Employee's duty of loyalty or material obligations under this Agreement; (vi) breach of any commercially reasonable Company policy and rule, provided such policy and rule is not *de minimis* in nature; (vii) failure to meet the Company's legitimate expectations, as reasonably determined by the Owners; (viii) conduct by Employee that is demonstrably and materially injurious to Company, monetarily or otherwise; (ix) causing Company to commit a material violation of any applicable law that has (or is likely to have) a material adverse effect on the Company; (x) disregard of a reasonable directive of the Owners; or (xi) neglect of the duties Employee is required to perform under this Agreement.

13) **Duty of Loyalty.** During employment with Company, Employee shall owe Company an undivided duty of loyalty, and shall take no action adverse to that duty of loyalty. Employee's duty of loyalty to Company includes but is not limited to a duty to promptly disclose to Company any information that might cause Company to take or refrain from taking any action, or which otherwise might cause the Company to alter its behavior. Without limiting the generality of the foregoing, Employee shall

6

promptly notify Company at any time that Employee decides to terminate employment with Company or enter into competition with Company, as Company may decide at such time to limit, suspend, or terminate Employee's employment or access to one or more of Company's Confidential Information, Trade Secrets, or customer relationships.

14) **Conflict of Interest**. Employee agrees not to engage in any conduct which might result in, or create the appearance of using Employee's position for private gain, or otherwise create a conflict of interest or the appearance of a conflict of interest with the Company or a Company client or customer. Such conduct includes without limitation having an undisclosed financial interest in any vendor or supplier of the Company, accepting payments of any kind or gifts other than of a nominal value from vendors, customers or suppliers, or having an undisclosed relationship with a family member or other individual who is employed by any entity in active or potential competition with the Company, and which creates a conflict of interest. While still employed at the Company, Employee must not establish, operate, participate in advice or assist to establish in any manner whatsoever any Conflicting Organization, and Employee must not take any preliminary or preparatory steps toward establishing or operating such a business.

15) **E-Mail Messages/Internet Usage**. Employee agrees to cooperate with the Company in its implementation of security and control measures as it may implement from time to time with respect to e-mail and Internet communications and shall take all reasonable precautions to ensure that the confidentiality of any such communications containing Trade Secret and Confidential Information is maintained. Employee also agrees that the Internet may not be used for the transmission or intentional reception of obscene, scandalous, offensive or otherwise inappropriate materials, and that Employee will comply with Company policies regarding appropriate use of the Internet and e-mail.

16) **Return of Company Property**. All equipment, books, records, papers, notes, catalogs, compilations of information, data bases, correspondence, recordings, stored data (including data or files that exist on any personal computer or other electronic storage device), software, and any physical items, including copies and duplicates, that Employee generates or develops or which come into Employee's possession or control, which relate directly or indirectly to, or are a part of the Company's (or its customers') business matters, whether of a public nature or not, shall be and remain the property of the Company, and Employee shall deliver all such materials and items, and any and all copies of them, to the Company on or before the Separation Date. During employment or after Separation Date, Employee will not copy, duplicate, or otherwise reproduce, or permit copying, duplicating, or reproduction of any Company documents or writings, whether stored on paper, magnetic tape, CD, electronically, or otherwise, including but not limited to notes, notebooks, letters, blueprints, manuals, drawings, sketches, specifications, formulas, financial documents, business plans, and the like, or any other documentation owned or originated by the Company and relating to the Company's business which, from time to time, may have come into Employee's possession, custody, or control as a result of or in the course of Employee's employment with the Company, without the express written consent of the Company, or, as a part of Employee's duties performed hereunder for the benefit of the Company. Employee expressly covenants and warrants, upon termination of Employee's employment for any reason (or no reason), that Employee shall promptly deliver to the Company any and all originals and copies in Employee's possession, custody, or control of any and all said property, documents or writings, and that Employee shall not make, retain, or transfer to any third party any copies thereof. In the event any Confidential Information or Trade Secrets are stored or otherwise kept in or on a computer hard

7

drive or other storage device owned by or otherwise in the possession or control of Employee (collectively, "Employee Storage Device"), upon the Separation Date, Employee will present to the Company for inspection and removal of all information regarding any Company (including but not limited to Confidential Information or Trade Secrets) stored on any Employee Storage Device.

17) **Successors and Assigns.** The Parties may not assign the rights and obligations in the Agreement without the express written consent of the other Party, except as provided in Section 4 of this Agreement.

18) **Survival of Rights and Obligations.** The Employee understands and agrees that the rights and obligations set forth in this Agreement will survive the Separation Date.

19) **Governing Law and Forum.** This Agreement is to be construed and interpreted in accordance with applicable federal laws and the laws of the state of Illinois, without regard to conflict of law principles of any jurisdiction. Any dispute, controversy, claim, or litigation arising out of or related to this Agreement, directly or indirectly, must be resolved in accordance with applicable federal laws and the laws of the state of Illinois. In the event of any controversy, claim or dispute between the Parties arising out of or relating to this Agreement, such controversy, claim or dispute must be filed exclusively in state or federal court in Cook County, Illinois.

20) **Severability.** If any portion of this Agreement is adjudicated to be invalid or unenforceable, the remaining provisions shall not be affected thereby, and a court of competent jurisdiction shall have the power to blue-line (amend, modify or delete) that portion thus adjudicated to be invalid or unenforceable.

21) **Remedies.** The Parties understand that in the event of a violation of any provision of this Agreement, each party has the right to seek injunctive relief, because no adequate remedy at law exists and it is not possible to measure damages for each injury precisely, in addition to any other remedies provided by law including actual, incidental and consequential damages. The Parties also agree that the each Party will be entitled to an accounting, and to the repayment of all profits, compensation, commissions, fees, royalties, or other financial rewards that one Party may realize as a result of that Party's violations of this Agreement. Any Party who breaches this agreement will reimburse the non-breaching Party for all costs, expenses or damages that the non-breaching Party incurs, including court costs, litigation expenses, and reasonable attorneys' fees. The parties agree that if there is a breach or threatened breach of any of such covenants, the Company may instead seek to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining the Employee from engaging in prohibited activities or such other relief as may be required to specifically enforce this Agreement or any of said covenants. The Parties agree that all remedies expressly provided for in this Agreement are cumulative of any and all other remedies now existing at law or in equity. In addition to the remedies provided in this Agreement, the Company will be entitled to avail itself of all such other remedies as may now or hereafter exist at law or in equity for compensation and for the specific enforcement of this Agreement, including the covenants contained in this Agreement. Resort to any remedy provided for in this Agreement or provided for by law will not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude a recovery of monetary damages and compensation. In the event that Employee breaches a restrictive covenant in this agreement, the time period of the restricted activity shall be extended for the time period of the breach beginning from the date that a court enters any type of injunctive relief.

22) **Entire Agreement**. This is the entire agreement of the parties relating to its subject matter and supersedes all previous and contemporaneous discussions, agreements, writings and understandings concerning the matters referenced in this Agreement, including without limitation the Prior Agreement. This Agreement may be modified only by a document manually signed both by Employee and the Owners of the Company.

23) **Acknowledgments**. The Parties acknowledge that: each has received legal counsel regarding this Agreement; that Employee is an employee "at will", meaning that either Employee or the Company may terminate Employee's employment at any time, for any reason not prohibited by law; that each Party has executed this Agreement without relying upon any representation or promise except those contained in this Agreement; and that each Party has read and understands this Agreement and agrees to all its terms and conditions.

24) **Venue**. The proper venue for any and all disputes arising under this Agreement shall be Cook County, Illinois, the State of Illinois, and federal courts.

25) **Headings**. Headings in this Agreement are for informational purposes only and shall not be used to construe the intent of this Agreement.

26) **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

27) **Reasonableness of Restrictions**. EMPLOYEE HAS READ THIS AGREEMENT AND AGREES THAT: THE RESTRICTIONS ON EMPLOYEE'S ACTIVITIES OUTLINED IN THIS AGREEMENT ARE REASONABLE AND NECESSARY TO PROTECT THE COMPANY'S LEGITIMATE BUSINESS INTERESTS; THE COMPANY'S WILLINGNESS TO EMPLOY EMPLOYEE CONSTITUTES FAIR, VALUABLE AND REASONABLE CONSIDERATION; AND, GIVEN THE IMPORTANCE TO THE COMPANY OF ITS CONFIDENTIAL INFORMATION, TRADE SECRETS, CUSTOMER RELATIONSHIPS AND GOODWILL, THE POST-EMPLOYMENT RESTRICTIONS ON EMPLOYEE'S ACTIVITIES ARE LIKEWISE FAIR AND REASONABLE. EMPLOYEE REPRESENTS AND WARRANTS THAT EMPLOYEE WILL BE ABLE TO SECURE EMPLOYMENT IN EMPLOYEE'S FIELD OF EXPERIENCE WITHOUT VIOLATING ANY PROVISION OF THIS AGREEMENT.

[Signatures located on the following page.]

9

Joshua A. Teague

Dated: 7/3/2015

Todd B. Bryant
Managing Member
Healthcare Development Partners

Dated: 7.6.15

Frank E. Talbert
Managing Member
Proteus Group, LLC

Dated: _____

10

Joshua A. Teague

Dated: 7/3/2015

Todd B. Bryant
Managing Member
Healthcare Development Partners

Dated:

Frank E. Talbert
Managing Member
Proteus Group, LLC

Dated: 7/6/2015

10

Schedule A

BONUS ELIGIBILITY FACTORS

(To be attached)

11

Schedule B

SUMMARY OF BENEFITS

**HEALTH INSURANCE**
Currently provided by Blue Cross Blue Shield. If you select Health Insurance, Vision is included as well at no extra charge. Vision is offered thru Davis Vision as a discount program. Vision cannot be purchased separately and is only offered if you are enrolled in the Health Plan. All full-time employees are offered insurance coverage for the employee and his/her immediate family. Coverage begins on the first day of the month following 30 consecutive days of employment. Premiums are paid with pre-tax dollars. The current plan is from November 1, 2014 thru October 31, 2015. You will receive an email when the open enrollment period starts.

**DENTAL INSURANCE**
Currently being provided by Metlife. Coverage begins on the first day of the month following 30 consecutive days of employment.

**LIFE INSURANCE/STD/LTD/AD&D**
Currently being provided by UNUM Provident and is paid for by the Company.

**LIFE INSURANCE**
The premium for Term Life Insurance is equal to your annual salary (not to exceed $100,000) and is fully paid by the Company. Coverage begins on the first day of the month following 30 consecutive days of employment.

**SHORT TERM DISABILITY (STD)**
The Short Term Disability plan provides coverage at 66.66% of your salary. Short Term Disability is paid for by HDP. Coverage begins on the first day of the month following 30 consecutive days of employment.

**LONG TERM DISABILITY INSURANCE (LTD)**
Long Term Disability Income Insurance offers protection equivalent to 60% of your gross annual income, payable up to maximum of $5000 per month. Long Term Disability is paid for by. Coverage begins on the first day of the month following 30 consecutive days of employment.

**HOLIDAYS**
Seven (7) holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving and Christmas Day. If any of these days fall on a weekend an email will be sent to all employees informing them of the day that the office is closed after Management makes the decision.

12

# EXHIBIT B

Sent from my iPhone

Begin forwarded message:

> **From:** jteague@hdpartners.com
> **Date:** May 23, 2017 at 8:44:37 PM EDT
> **To:** Todd Bryant <tbryant@hdpartners.com>
> **Subject: Fwd: 5% in Sierra Bloom**
> Resending this email so you can find it more easily. Thanks.

Sent from my iPhone

Begin forwarded message:

> **From:** jteague@hdpartners.com
> **Date:** May 23, 2017 at 10:34:44 AM EDT
> **To:** Todd Bryant <tbryant@hdpartners.com>
> **Subject: 5% in Sierra Bloom**
> Todd,
>
> I appreciate your time this morning in discussing our partnership in Sierra Bloom. Per our conversation, you confirmed verbally that I will receive a 5% interest in the Sierra Bloom parent structure owning all underlying SB projects (5% or your 60% interest). This interest will either be direct in the NB entity with Jerry (in which case my interest would be 3%) or under a LLC to be formed and managed by you, in keeping with the reasonable minority provisions we've discussed before. I understand that the choice of structure is yours and will defer to your judgment and it's a document that will be finalized quickly. Additionally, once we have a resolution allowing both the UHS and Greenfield projects to move forward, we've agreed that we'll renegotiate to a percentage higher than 5%.
>
> I value our partnership and look forward to putting this behind us. I would appreciate a simple confirmation of this understanding via your response to this message. Thank you.
>
> Josh

**From:** Todd Bryant [mailto:tbryant@hdpartners.com]
**Sent:** Saturday, May 27, 2017 7:53 AM
**To:** Joshua Teague <jteague@hdpartners.com>
**Cc:** Todd Bryant <TBryant@hdpartners.com>
**Subject:** Re: 5% in Sierra Bloom

Josh,

Confirmed.  Looking forward to have you as a partner on this deal and many more in the future.

Todd

On May 25, 2017, at 7:07 AM, jteague@hdpartners.com wrote:

Todd - resending this again.  Please respond for confirmation as we discussed.

# EXHIBIT C

Joshua A. Teague
9113 Cameron Wood Drive
Charlotte, NC 28210

October 6, 2017

Mr. Todd Bryant
Healthcare Development Partners
180 North Michigan Avenue, Suite 510
Chicago, IL 60601

RE: Resolution to Ongoing Breaches of Employment Agreement

Dear Todd,

This letter is written in an effort to come to a resolution regarding the numerous breaches of my Employment Agreement that have been in existence since as early as December 2015.

I've made numerous attempts over the past two years to address these issues. However, despite multiple attempts to secure compliance with the contract, I've received no cooperation from you. These issues remain outstanding. I'm no longer willing to allow these breaches to continue. Therefore, I must demand a resolution in the form of your honoring the full extent of the Employment Agreement immediately. Below is a brief summary and time line of the breaches and associated communications between us:

December 2015:    Section 7(c) of the Employment Agreement outlines the terms under which "Incentive Compensation" is to be paid. The Section requires completion of a "Schedule A" that will outline eligibility factors and criteria under which I am to receive annual bonuses equivalent to 20% of my Base Salary. The language states that "It is the intent of the Parties to complete Schedule A at a future date in the calendar year of 2015." On several occasions, I approached you to finalize "Schedule A" and you continually have delayed completion to where now it is October 2017 and a "Schedule A" is still not in existence. In short, over two years have passed since we entered into my Employment Agreement and the Company has not made one substantive response to my multiple requests to finalize the Incentive Compensation as required by Section 7(c) nor has any Incentive Compensation been received.

April 2016:    Under Section 7(c), the first annual bonus was due in April 2016. When I approached you for payment that month, you refused. Verbally, you indicated that you would increase my bonus from 20% to 40% if I would agree to defer payment until the following two items were completed: (i) completion of Valley Health lease renewal (Winchester, VA); and (ii) completion of a substantive agreement with Universal Health Services (Scottsdale, AZ). You would not provide documentation of such agreement but I, in good faith, accepted these terms. Item (i) was completed in June 2016 and item (ii) was completed in December 2016. When approached for payment in December 2016 for the 40% bonus, you stated you had no recollection of our conversation and have continued to refuse payment of any form of Incentive Compensation, notwithstanding Section 7(c).

October 2016:    Section 7(e) of the Employment Agreement requires that you provide benefits, inclusive of health insurance. The Company failed to pay the premiums for

continuation of health insurance effective October 2016 but I and all other employees were informed that insurance was active. As a result, my family and I unknowingly had no health insurance for the month of October 2016 and were required to pay several claims out-of-pocket that would've otherwise been covered by the health insurance plan. It wasn't until November 2016 that the health insurance company provided notification that claims in October would not be covered.

December 2016:
Section 7(b) outlines the terms under which Base Salary is to be paid. Between July and December 2016, you withheld approximately $20,000 in Base Salary. I made it clear on numerous occasions that I was not accepting such withholding. On February 9, 2017, you signed an agreement to pay such funds within 30 days but then continued to delay payment until April 2017 and remitted payment only after I documented a demand for immediate resolution. Thus, this payment in 2017 will cause me to have to recognize the $20,000 as 2017 income which has negative tax consequences.

December 2016:
Section 7(f) outlines the terms under which business expenses are to be reimbursed. Over the course of the year in 2016, I submitted over $12,000 of expenses that were not reimbursed by the end of 2016. On February 9, 2017, you signed an agreement to pay such funds within 30 days but then continued to delay payment until April 2017 and only remitted payment after I documented a demand for immediate resolution. However, $557.58 for a car rental (July 2016) and $589.88 for an office chair purchase (Oct 2016) were inappropriately refused for reimbursement and remain outstanding.

April 2017:
Under Section 7(c), an annual bonus equivalent to 20% of my base salary was due and payable. Similar to the unpaid April 2016 bonus, you continued to refuse to finalize a "Schedule A". When I requested payment of the bonus in April 2017, you stated that you don't believe in bonuses and that I should focus my efforts on earning project equity instead. Despite my maintaining that a bonus clearly is a critical term of the Employment Agreement, (see Section 7 (c)) you have continued to refuse to enter into a "Schedule A" or define any eligibility criteria otherwise.

May 2017:
Section 9 of the Employment Agreement outlines that I am to receive a percentage of a "Promote" in projects in which I'm acting in a "direct managerial role". There are two separate issues outlined below that pertain to this language:

- Sierra Bloom (Scottsdale, AZ) -- Beginning in mid-2016 and continuing to present, I have been requesting a definitive document finalizing my ownership interest in the Promote related to the Sierra Bloom projects. You repeatedly refused to negotiate a percentage of ownership until March 2017, at which time you verbally stated that I could "lock in" at an interest of 8%. When I pressed to have this in writing, you refused to engage in conversation until May 2017 at which time you arbitrarily reduced the percentage to 5%. In an effort to obtain documentation on the issue, I generated an email on May 23rd which you subsequently confirmed on May 27th stating that I am to receive a 5% interest in Sierra Bloom and that this interest will be increased in the event Universal Health Services is fully documented and we come to a solution to fix a situation with a project in Winchester, VA whereby our tenant has since filed a lawsuit for breach of contract. Even after we agreed upon such terms and further agreed that

an operating agreement finalizing the terms would be signed quickly, you have continued to delay completion of an agreement. This clearly is another violation of a critical term of the Employment Agreement. Moreover, you have encumbered your interest by placing it as collateral against other projects and loans to which I'm not a party and such collateralization directly devalues my interest.

- 333 W. Cork Street (Winchester, VA) – I have held a "direct managerial role" in the project at Cork Street and when I originally became involved in the project in January 2016, you verbally stated that I would receive a percentage of ownership as outlined in the Employment Agreement (the Employment Agreement references a range of 10-35% ownership). I continue to have received no documentation of such interest.

September 2017: Under Section 7(b) relating to Base Salary, beginning in the month of September 2017 you unilaterally began paying only half of my salary and this practice continues to the present date. I have documented that I have not agreed to this reduction in my salary but you continue to refuse to reinstate my full salary.

October 2017: Under 7(f), over $2,500 in 2017 expenses for the Winchester, VA project and general HDP business expenses are currently outstanding.

Todd, I've written this letter because I feel that I have no other options available to me, given the 2+ years of delay and the above multiple violations of the terms of the Agreement.

I appreciate your immediate attention to this matter. I look forward to a resolution allowing us to move forward under the terms of the Employment Agreement.

Sincerely,

Joshua A. Teague

# EXHIBIT D

**From:** Todd Bryant <tbryant@hdpartners.com>
**Date:** October 6, 2017 at 10:51:34 PM EDT
**To:** Josh Teague <jteague@hdpartners.com>
**Cc:** Jerry Nudo <gnudo@marcrealty.com>, Mitchell Roth <
mroth@muchshelist.com>, jfinfer@dimontelaw.com
**Subject: Re: Employment Agreement issues**

You just fucked your self.


Sent from my iPhone

On Oct 6, 2017, at 5:00 PM, Josh Teague <
jteague@hdpartners.com> wrote:

> Todd,
>
> Please read the attached letter. Thank you and I look forw
> to resolving this quickly.
>
> Josh
>
> <image003.jpg>
>
> JOSH TEAGUE | Senior Vice President
> C 704.618.1153 | HDPartners.com
> 180 North Michigan Avenue | Suite 510 | Chicago, Illinois 60601
>
> HEALTHCARE DEVELOPMENT PARTNERS

# EXHIBIT E



October 13, 2017

By e-mail: jteague@hdpartners.com
Mr. Joshua A. Teague
9113 Cameron Wood Drive
Charlotte North Carolina 28210

Re:     Termination of employment and transition

Dear Joshua:

This letter constitutes Healthcare Development Partners, LLC's (HDP) notice of termination of your employment effective today, October 13, 2017. HDP is terminating your employment for "cause" under the July 3, 2015 Employment Agreement. Among other things, you are being terminated for your gross mismanagement in the performance of your duties, conduct that has resulted in HDC losing hundreds of thousands of dollars or greater.

Upon your receipt of this letter, you are to have no further contact with HDP's customers, vendors, or key employees. If you receive phone calls, emails, text messages, or other communications from these persons, you are to forward the communication or the person directly to me.

You are in possession of HDC property, including, without limitation, a laptop computer. We will be in touch with you shortly for purposes of retrieving all HDC property, no matter what form, and whether electronic or otherwise.

HDC reminds you of your confidentiality, non-solicitation, and non-competition obligations under the Employment Agreement. HDC takes these obligations seriously and will act accordingly should you violate these terms.

I will be in touch with you in the next several days to discuss the status of projects in which you were involved. HDC asks that you assist in transitioning your duties. If you cooperate with this process, abide by your obligations under the Employment Agreement, and refrain from disparaging HDP and its agents, HCD will help ease your transition to other employment.

Sincerely,

Todd B. Bryant

# EXHIBIT F

Law Offices



77 West Washington Street - 20th Floor
Chicago, Illinois 60602-2983
Telephone (312) 263-6330

Fax (312) 372-5555
www.kfeej.com

Katz Friedman

Eagle  Eisenstein  Johnson  Bareck

PHILIP A. BARECK
DAVID M. BARISH
FRANK J. BERTUCA
JASON P. CARROLL
WARREN E. EAGLE
STANLEY EISENSTEIN
DEBORAH WEISS FERTEL
JOSHUA M. FILE
IRVING M. FRIEDMAN*
MARTHA A. GARCIA
CHRISTOPHER J. JOHNSON

RICHARD K. JOHNSON
HAROLD A. KATZ*
CHRISTOPHER W. MOSE
KEITH SPARKS
BRIDGETTE VAN TUYLE
TIMOTHY F. WINSLOW

*DECEASED

OF COUNSEL
DAVID E. RAPOPORT

November 2, 2017

<u>VIA U.S. MAIL and E-MAIL(tbryant@hdpartners.com)</u>
Mr. Todd Bryant
Healthcare Development Partners, LLC
180 North Michigan Ave., Suite 510
Chicago, Illinois 60601

Re:    Joshua Teague v. Healthcare Development Partners, LLC and Todd Bryant

Dear Mr. Bryant:

This law firm has been retained by your former employee, Joshua Teague, to represent him in his claims against Healthcare Development Partners, LLC ("HDP"), and you personally, to collect unpaid wages, bonuses and other compensation due under his June 2015 Employment Agreement.

As you know, on October 6, 2017, Mr. Teague sent you a detailed letter setting forth a myriad of contractual breaches by you and HDP, including numerous underpayments of wages and, in many instances, outright refusal by you to pay contractually owed wages, bonuses and other compensation. Copy enclosed for your convenience. Less than one week after receiving Mr. Teague's letter seeking to enforce his contractual rights, HDP abruptly and inexplicably terminated his employment.

By letter dated October 13, 2017, you suddenly claimed that Mr. Teague was terminated for "gross mismanagement in the performance of [his] duties, conduct that resulted in HDP losing hundreds of thousands of dollars or greater." In order to evaluate the merit, or lack thereof, of such claim, Mr. Teague hereby demands a detailed explanation of any alleged "gross mismanagement" of his duties, citing specific examples, and, pursuant to Section 21 of the Employment Agreement, he demands a full accounting of any monetary losses allegedly caused by his action(s).

Further, pursuant to the Illinois Personnel Record Review Act, 820 ILCS § 40/1 et seq., Mr. Teague hereby requests a complete and accurate copy of his employee personnel file maintained by HDP. I have enclosed an "Authorization" for HDP to release Mr. Teague's personnel records directly to my office. Please complete the enclosed "Certificate of Completion" and send it back to me along with the requested documents within seven (7) days of the date of this request.

Below is a summary of what is currently owed to Mr. Teague by virtue of HDP's numerous breaches of the Employment Agreement:

- Unpaid wages from August 16, 2017 through October 13, 2017 totaling $17,839.47.

- Unreimbursed business expenses and out of pocket healthcare costs dating back to October 2016 totaling approximately $10,000.

- Unpaid annual incentive bonuses from 2015-2016 ($58,000), 2016-2017 ($29,000) and prorated for 2017-2018 ($15,456.04) totaling $102,456.04.

- Mr. Teague was contractually promised 5% ownership stake in the Sierra Bloom development project. Based on a conservative estimate, the net present value of Mr. Teague's 5% stake is $1,870,159.00 (based on total cash payout of $3,794,379.50).

- Mr. Teague was also contractually promised a 10% ownership stake in the Winchester project. The net present value of Mr. Teague's 10% ownership stake is still to be determined.

In addition to the amounts described above, Mr. Teague is entitled to interest, as well as a 2% per month penalty on the underpayments/non-payments of wages and bonuses pursuant to the Illinois Wage Payment and Collections Act ("IWPCA"), as well as costs, expenses and attorneys' fees. 820 ILCS § 115/1 et seq.

**In total, Mr. Teague is currently owed $2,000,454.51, plus his 10% ownership interest in the Winchester project.**

Mr. Teague hereby demands full and prompt payment of the amounts described above. Additionally, due to the myriad contractual breached by HDP, Mr. Teague demands a full release from the non-solicitation and non-competition provisions of the Employment Agreement.

Please have your legal representative contact my partner, Joshua File, or me to discuss payment. If we do not hear from you or your lawyer in a reasonable time, we are prepared to file suit in the Circuit Court of Cook County, Illinois. Under Section 13 of the IWPCA, you will be individually named and may be held personally liable for the amounts owed to Mr. Teague if this matter is to proceed to litigation. We look forward to your prompt response.

Sincerely,

Stanley Eisenstein

Enclosures
Cc:   Ms. Josh Teague
       Mr. Joshua File