**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOSHUA TEAGUE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 18 C 601 |
| v. | ) |
| | ) Hon. Marvin E. Aspen |
| HEALTHCARE DEVELOPMENT | ) |
| PARTNERS, LLC and TODD BRYANT, | ) |
| Individually and as Agent of HEALTHCARE | ) |
| DEVELOPMENT PARTNERS, LLC, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

In 2015, Plaintiff Joshua Teague entered into an employment agreement with Defendant

Healthcare Development Partners ("HDP"), a real estate development and property management

company. (Employment Agreement ("Contract") (Dkt. No. 48–8) at 16–17;

Answer (Dkt. No. 14) ¶ 2.) Defendant Todd Bryant, a managing member of HDP, executed the

contract on HDP's behalf. (Contract at 16–17.) Teague was eventually terminated by HDP after

approximately two years of employment. (Dkt. No. 48–8, Ex. E at 30.)[1] Following his

termination, Teague sued HDP and Bryant (collectively "Defendants") claiming that they failed

to pay him his full salary, incentive compensation, and reimbursements for business expenses.

(Compl. (Dkt. No. 1).) Presently before us is Teague's motion for summary judgment as to

liability for breach of contract, violation of the Illinois Wage Payment & Collection Act

---

[1] Some of the parties' exhibits include sub-exhibits that have been filed as single docket entries.
Where this is the case, we cite the letter of each exhibit as the parties have referred to them. We
also observe that Teague filed his Local Rule 56.1 statement of facts and supporting documents
twice. (*See* Dkt. Nos. 48, 50.) We cite only the documents under Docket Number 48.

("IWPCA"), 820 ILCS 115/1 *et seq.*, and declaratory judgment. (Mot. for Summ. J. ("SJ Mot.") Dkt. No. 46).) Also before us is Defendants' motion to strike paragraphs within Teague's Local Rule 56.1 statement of material facts. (Dkt. No. 65.) For the reasons set forth below we grant in part and deny in part Defendants' motion to strike and deny Teague's motion for summary judgment.

## MOTION TO STRIKE

Before outlining the background facts, we address Defendants' motion to strike. Defendants' motion stems from the parties' dispute over two sets of requests for admission made by Teague. (*See* Dkt. Nos. 48–1, 48–2.) Teague claims that Defendants' responses to his requests were deficient and threatened to move to have the facts in his requests deemed admitted. (Dkt. No. 48–5 at 2–3.) Teague never filed such a motion, and later filed his present motion for summary judgment and corresponding Local Rule 56.1 statement of material facts. (SJ Mot.; Pl.'s Statement of Material Facts ("Pl.'s Facts") (Dkt. No. 48).) In his statement of facts, Teague included a section titled "Defendants' Admissions of Fact Under Rule 36," which outlines the history of his requests for admission and Defendants' responses. (Pl.'s Facts ¶¶ 6–10.) Defendants responded to Teague's statement of facts admitting and denying the assertions therein. (Defs.' Resp. to Pl.'s Facts (Dkt. No. 60).) Two weeks later, Defendants moved to strike paragraphs 6–10, 12–13, 17–18, 30, and 34 of Teague's statement of facts. (Mot. to Strike at 3.)

Motions to strike are disfavored unless they serve to help expedite proceedings and are generally not granted when ruling on motions for summary judgment. *Sun v. Bd. of Trs. of Univ. of IL*, 429 F. Supp. 2d 1002, 1030 (C.D. Ill. 2006); *RLJCS Enters., Inc. v. Prof'l Ben. Tr., Inc.*, 438 F. Supp. 2d 903, 906 (N.D. Ill. 2006). In the Northern District of Illinois, a party moving for

summary judgment must submit "a statement of material facts as to which [it] . . . contends there is no genuine issue and that entitle [it] to a judgment as a matter of law." L.R. 56.1(a). The statement must "consist of short numbered paragraphs" with "specific references to . . . affidavits, parts of the record, and other supporting materials relied upon." *Id.* If a factual statement is not supported by the material cited, it will not be credited. *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). Further, the "statement should be limited to *material* facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion." *Malec*, 191 F.R.D. at 583 (emphasis in original). The non-moving party is required to respond to the movant's statement and "in the case of any disagreement" provide specific citations to the material relied upon. L.R. 56.1(b)(3). Facts denied without support will be considered undisputed. *Garber v. Amazon.com, Inc.*, 380 F. Supp. 3d 766, 770 (N.D. Ill. 2019). Further, both parties must be diligent and specific in the materials they cite in support of their assertions or denials, as it is improper to cite "an entire deposition, affidavit, or other exhibit document." *Malec*, 191 F.R.D. at 583. District courts are not required "to scour the record in search of material factual disputes" *Roger Whitmore's Auto. Servs., Inc. v. Lake Cty., Ill.*, 424 F.3d 659, 664 n.2 (7th Cir. 2005), and may ignore documents "not referred to in the statement of facts." *Malec*, 191 F.R.D. at 583.

Of the statements Defendants seek to strike, many of them are not material and relate only to the circumstances of Teague's requests for admission. (*See* Pl.'s Facts ¶¶ 6–10.) Because these statements are not material, they are stricken. Two of the six remaining statements, paragraphs 12 and 13, were admitted by Defendants in their response to Teague's statement of facts. (Defs.' Resp. to Pl.'s Facts ¶¶ 12–13). Defendants have also not cited any

evidence to support a denial of these facts. Thus, paragraphs 12 and 13 will be considered undisputed for the purposes of Teague's motion for summary judgment.

Facts contained in paragraphs 17 and 18 will also be considered undisputed for the purposes of Teague's summary judgment motion because they are not subject to genuine dispute. Paragraphs 17 and 18 state that Teague "made multiple requests/demands" for Bryant to complete a portion of the contract and Bryant never did. (Pl.'s Facts ¶¶ 16–17.) These statements are supported by Teague's personal declaration. (Decl. of Joshua Teague ("Teague Decl.") (Dkt. No. 48–8) ¶¶ 6–7.) Defendants incorrectly deny these assertions by citing to an entire affidavit rather than specific paragraphs (Defs.' Resp. to Pl.'s Facts ¶¶ 16–17), and our review of the affidavit cited does not demonstrate that the facts are subject to genuine dispute. (*See* Aff. of Todd Bryant ("Bryant Aff.") (Dkt. No 63–1).) Thus, paragraphs 17 and 18 will be considered undisputed for the purposes of Teague's summary judgment motion.

As for paragraph 30, Defendants incorrectly cite an entire affidavit to support their denial. (Defs.' Resp. to Pl.'s Facts ¶ 30.) However, because many of the paragraphs within the affidavit cited support Defendants' denial, we will consider the fact in paragraph 30 genuinely disputed but will not strike it. Finally, Paragraph 34 will not be credited for the purposes of Teague's motion for summary judgment. Paragraph 34 states that Defendants' attorney admitted that Defendants' owed Teague money. (Pl.'s Facts ¶ 34.) The only materials cited in support of this alleged fact are Teague's requests for admission, Defendants' responses, and Teague's objections to those responses. However, none of these materials support the fact asserted in paragraph 34. While there is evidence that Defendants' attorney offered to pay Teague some money, she was clear that HDP's "position is that it does not owe Mr. Teague the monies

demanded." (Dkt. No. 48–1 at 13–14.) Thus, we will not consider the fact asserted in paragraph 34 for the purposes of Teague's motion for summary judgment but decline to strike it.

In sum, we grant Defendants' motion in part and strike paragraphs 6–10 of Teague's statement of material facts. Defendants' motion is denied in all other respects. The facts in paragraphs 12–13 and 17–18 will be considered undisputed for the purposes of Teague's motion for summary judgment, paragraph 30 will be considered genuinely disputed, and paragraph 34 will not be credited.

## BACKGROUND

The facts outlined hereafter are taken from the parties Local Rule 56.1 statements and the materials cited therein and are undisputed unless otherwise noted subject to the qualifications outlined above. In July 2015 Teague entered into an employment agreement with HDP to serve as a senior vice president. (Pl.'s Facts ¶ 11; Contract at 16–17.) Teague's basic responsibilities were to manage or assist in managing real estate development projects around the United States. (Contract at 9, § 5.) For his efforts, Teague was to "receive an annual base salary of $145,000 annualized, subject to review from time to time and no less often than annually." (*Id.* at 10, § 7(b).) HDP's managing members, Bryant and Frank Talbert, whom the contract defines as HDP's "Owners," signed the contract on HDP's behalf. (*Id.* at 9, § 4.)

## I.    BONUS COMPENSATION

As part of the contract, Teague was "eligible to receive . . . an annual bonus equivalent to 20% of [his] base salary based on [his] performance." (Contract at 10, § 7(c).) Bonuses were to be "reasonably determined by the Owners, and based on eligibility factors and criteria, [that would be] determined by [Teague] and the Owners and attached as Schedule A to th[e] Agreement." (*Id.*) The contract also stated that it was "the intent of the Parties to complete

Schedule A . . . in the calendar year of 2015." (*Id.*) Despite this language, the parties never completed Schedule A. (Teague Decl. ¶¶ 6–7; Bryant Aff. ¶ 4.) Teague did, however, demand that Bryant complete Schedule A on several occasions in 2015. (Teague Decl. ¶ 6.) Teague also claims that in April 2016 he and Bryant had a meeting where Bryant promised to pay him a bonus of 40% of his salary if he completed certain tasks. (*Id.* ¶ 11.) Bryant denies ever promising to pay Teague any kind of bonus over the course of his employment. (Bryant Aff. ¶ 28.)

## II.    PROJECTS AND PROMOTED INTERESTS

Teague worked on at least two projects during his employment. One was based in Winchester, Virginia (the "Winchester Project") and another was based in Phoenix, Arizona (the "Sierra Bloom Project"). (Teague Decl. ¶ 8; Dkt. No. 48–8, Ex. B at 21.) The nature of these projects and Teague's role within them is unclear, but Teague did play a "direct managerial role" in the Winchester project. (Teague Decl. ¶ 8.) Teague asserts that Bryant promised him a 10% stake in the Winchester Project and a 5% stake in the Sierra Bloom Project. (*Id.* ¶¶ 8–9.) These promises were never made according to Bryant. (Bryant Aff. ¶ 28.)

The contract did allow Teague to earn additional compensation for projects he was involved in. (Contract at 10–11, § 9.) The contract states:

> The Parties acknowledge that the investment structure of certain projects pursued by [HDP] may contain a promoted interest[2] as added incentive to [HDP] (the "Promote"). To the extent [Teague] provides a direct managerial role in projects where a Promote exists [Teague] will receive a percentage of the Promote within the range of 10–35% as mutually determined by the Parties on a case-by-case basis.

(*Id.*) The contract also references the Sierra Bloom Project:

---

[2] In general terms, a promote is "an additional [financial] incentive for one . . . to see that a project succeeds." *Scion 2040 Managing Member LLC v. EBREF Holding Co., LLC*, No. 10 C 825, 2011 WL 6382904, at *2 (E.D. Wis. Dec. 20, 2011).

[Teague's] percentage of any Promote related to the Sierra Bloom campus in Phoenix, Arizona is anticipated to be within the range of 5–10% as mutually determined by the Parties.

(*Id.*)  Teague was never paid any promoted interest compensation for these projects during his employment.  (Teague Decl. ¶ 28.)

## III.   TEAGUE'S PERFORMANCE AND TERMINATION

Starting in January 2017, Bryant began to complain to Teague about his job performance. First, Bryant emailed Teague stating that he needed "a bigger effort [from him]" and asked that he "make personal sacrifices" to push his projects forward.  (Dkt. No. 63–1, Ex. A at 8.)  In April 2017, Bryant complained to Teague about the number of vacations he was taking during what Bryant described as a "crisis" with the Winchester Project and criticized Teague for "demonstrating a lack of judgment."  (*Id.*, Ex. B at 10.)  One month later, Bryant informed Teague that he "continually let [him] down" and was "sick of [Teague's crap]" and "lack of . . . results."  (*Id.*, Ex. D at 16.)  During this same period, at least one HDP client complained to Teague about his work claiming that after "several extensions" it still did not have a "realistic proposal."  (*Id.*, Ex. C at 13.)

In August 2017, Bryant and HDP's other managing member, Talbert, reduced Teague's salary by 50%, citing his "poor performance" as the reason.  (Bryant Decl. ¶ 22.)  After receiving reduced pay for part of September 2017, Teague emailed Bryant and another HDP employee, Nancy Rich, inquiring why he was receiving reduced pay.   (Dkt. No. 48–8, Ex. F at 32.)  Rich informed Teague that he was being paid "at the revised rate" and would continue to be paid at that rate.  (*Id.*)  On October 6, 2017, Teague sent Bryant a letter outlining several grievances including not being paid his fully salary or incentive compensation and not being reimbursed for business expenses.  (*Id.*, Ex. C at 24–26.)  Bryant responded to Teague's letter via email

exclaiming that Teague had "just fucked [himself]." (*Id.*, Ex. D at 28.) Four days later, on

October 10, 2017, Teague formed his own company called S4 Ventures, LLC and solicited at

least one manager associated with the Winchester Project by offering to provide consulting

services in exchange for a fee. (Dkt. No. 63–4 at 2–4.) Bryant terminated Teague a few days

later on October 13, 2017. (Dkt. No. 48–8, Ex. E at 30.) Bryant informed Teague that he was

terminated for "gross mismanagement in the performance of [his] duties." (*Id.*)

## IV.     NONSOLICITATION AND NONCOMPETITION

The contract includes nonsolicitation and noncompetition provisions.

(Contract at 12, § 12.) Section 12 provides that if Teague is terminated for "cause" he cannot,

among other things, sell competing products and services or solicit certain HDP customers for a

period of two years. (*Id.*) The contract specifies that termination for cause includes termination

for breach of the "duty of loyalty or material obligations under t[he] Agreement"; "failure to

meet [HDP's] legitimate expectations, as reasonably determined by the owners"; conduct that is

"demonstrably and materially injurious to [HDP]"; "disregard of a reasonable directive of the

Owners"; or "neglect of the duties [Teague] is required to perform under th[e] Agreement." (*Id.*)

### STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to

identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this

burden of production, the nonmoving party "may not rest upon the mere allegations or denials of

the adverse party's pleading" but rather "must set forth specific facts showing that there is a

genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary

judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all

reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## ANALYSIS

Teague argues that summary judgment should be granted because there is clear evidence

that Defendants breached the parties' contract by not performing their payment obligations.

(Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s SJ Mem.") (Dkt. No. 49) at 7–9.) He

also argues that HDP's breaches amount to a violation of IWCPA (*id.* at 9–10), which allows

plaintiffs to recover wages owed pursuant to an employment agreement. *Wharton v. Comcast

Corp.*, 912 F. Supp. 2d 655, 657–58 (N.D. Ill. 2012); 820 ILCS 115/2. Finally, Teague argues

that the contract's noncompetition provisions should be declared null and void because of

Defendants' material breaches and because he was retaliatorily fired. (Pl.'s SJ Mem. at 11–12.)

## I.  BREACH OF CONTRACT

"[T]o prevail on a breach of contract claim the plaintiff must show: (1) the existence of a

valid and enforceable contract, (2) [the plaintiff] substantially performed the contract, (3) the

defendant breached that contract, and (4) damages resulted from the alleged breach of contract."

*Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018).[3]  Teague argues that Defendants breached the contract by: reducing his salary, not setting his bonus criteria or paying him a bonus, not paying him a promoted interest in the Winchester or Sierra Bloom projects, and not reimbursing him for out-of-pocket business expenses.  (Pl.'s SJ Mem. at 7–8.)  We address each alleged breach in turn.

### A.    Salary Reduction

Defendants argue that HDP did not breach by reducing Teague's salary because it was contractually permitted to do so based on Teague's poor performance.  (Def.'s Am. Resp. to Pl.'s SJ Mem. ("Am. Resp.") (Dkt. No. 62) at 5–6.)  The salary provision states:

> During the Employment Period, [Teague] will receive an annual base salary of $145,000 annualized, subject to review from time to time and no less often than annually.

(Contract at 10, § 7(b).)  Defendants argue that the phrase "subject to review" means Teague's salary could be evaluated and reduced by HDP.  (Am. Resp. at 5–6.)  Teague does not offer his own interpretation of the salary provision and instead insists that any salary reduction needed to be agreed to in writing pursuant to the contract's modification provision.  (Pl.'s Reply to Defs.' Am. Resp. ("Reply") (Dkt. No. 68) at 3–5; *see also* Contract at 15, § 22 (outlining modification requirements).)

"In construing a contract, the primary objective is to give effect to the intention of the parties."  *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 689–90 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 2621 (2018).  This is done by "look[ing] to the language

---

[3] The parties do not raise any dispute regarding the applicable law and both cite to Illinois law. "When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits."  *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008).  Thus, we apply Illinois law.

of a contract alone" according to "its plain and ordinary meaning." *Id.* (quoting

*Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 58 (Ill. 2007)). We must also construe

the contract "as a whole, viewing each part in light of the others," *Gallagher*, 226 Ill. 2d at 233,

874 N.E.2d at 58, and "seek to give effect to each clause and word used, without rendering any

terms meaningless." *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267

(7th Cir. 2016), *as amended* (Jan. 25, 2017). If after taking these steps it becomes apparent that

the "language is reasonably or fairly susceptible to multiple meanings" the contract will be

deemed ambiguous. *Bank of Commerce v. Hoffman*, 829 F.3d 542, 546 (7th Cir. 2016). If a

contract is ambiguous, we may "consider extrinsic evidence to ascertain the parties' intent."

*Gallagher*, 226 Ill. 2d at 233, 874 N.E.2d at 58.

We conclude that HDP had the contractual right to review and reduce Teague's salary.

The phrase "subject to" means "governed by" or "subordinate to." *See Herr v. United States

Forest Serv.*, 865 F.3d 351, 357 (6th Cir. 2017) ("'[S]ubject to' means 'subordinate' or

'subservient'" (citing *Black's Law Dictionary* 1278 (5th ed. 1979))); *Portland Gen. Elec.

Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1028–29 (9th Cir. 2007) (concluding that the

"phrase 'subject to' means 'governed or affected by'"); *Cedyco Corp. v. PetroQuest Energy,

LLC*, 497 F.3d 485, 488–89 (5th Cir. 2007) ("'Subject to' means 'likely to be conditioned,

affected, or modified in some indicated way.'" (quoting Webster's Unabridged Dictionary 2275

(3d ed.1993))). The word "review" means "consideration, inspection, or reexamination of a

subject or thing." Black's Law Dictionary (11th ed. 2019); *see also In re Dependency of A.P.*,

177 Wash. App. 871, 878, 312 P.3d 1013, 1016 (Wash. Ct. App. 2013) ("Indeed,

the word 'review' means 'to examine again.'"). Considering the meaning of "review" and

"subject to" together demonstrates that Teague's salary was subordinate to HDP's inspection or

reexamination "from time to time" (Contract at 10, §7(b)), meaning HDP had discretion to reduce Teague's salary.

Another potential meaning of the phrase "subject to review" also supports this conclusion. If the phrase "subject to review" means only that HDP could examine Teague's salary, then the clause is virtually meaningless. As Teague's employer, HDP could undoubtedly look at Teague's salary whenever it wanted with or without the contractual right to do so, if for no other reason than to track its liabilities. Interpreting "subject to review" in this way would run counter to the principle that we should "seek to give effect to each clause and word used." *Selective Ins. Co.*, 845 F.3d at 267; *see also Thompson v. Gordon*, 241 Ill. 2d 428, 442, 948 N.E.2d 39, 47 (Ill. 2011) ("[W]hen parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect.")

The modification provision does not change our conclusion. That clause only outlines the requirements for modifying the contract by requiring modifications to be made "by a document manually signed both by [Teague] and the Owners of the Company." (Contract at 15, § 22.) A modification is a change that "introduces new elements into the details of the contract and cancels others." *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998). There is no modification when a party merely exercises a right already prescribed by the contract.

While HDP had discretion to reduce Teague's salary, it was still required to exercise this discretion in good faith. *See Wilson v. Career Educ. Corp.*, 844 F.3d 686, 691 (7th Cir. 2016) ("The covenant of good faith and fair dealing requires . . . that discretion be exercised reasonably with proper motive."); *Gore v. Ind. Ins. Co.*, 376 Ill. App. 3d 282, 286, 876 N.E.2d 156, 161–62 (1st Dist. 2007) ("Disputes involving the exercise of good faith [can] arise when one party is

given broad discretion in performing its obligations under the contract."). Thus, HDP could not act "arbitrarily or capriciously or in a manner inconsistent with reasonable expectations" when reducing Teague's salary. *Wilson*, 844 F.3d at 691.

HDP has presented evidence that its decision to reduce Teague's salary was not arbitrary. Bryant sent Teague multiple emails regarding his performance from January to May 2017 and testified that he "frequently reviewed Teague's performance in conjunction with his compensation" and decided to reduce Teague's salary in August 2017 "due to [his] poor performance." (Bryant Aff. ¶¶ 5, 21–22; Dkt. No. 63–1, Exs. A–B, D–E at 7–11, 15–19.) Because Defendants have presented some evidence that their decision to reduce Teague's salary was not arbitrary, it has done all that is required to stave off summary judgment. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) ("[T]he non-movant need not . . . persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact."). We therefore deny summary judgment as to Teague's breach of contract claim with respect to his reduction in salary.

### B. Bonus Compensation

Teague argues that Defendants breached by not setting forth his bonus criteria in Schedule A of the contract and not paying him any bonuses during his employment. (Pl.'s SJ Mem. at 7; Reply 5–8.) Defendants respond that the payment of bonuses was discretionary and that HDP decided not to pay Teague any bonuses after evaluation of his performance. (Am. Resp. at 6–7.) Defendants also argue that Teague was mutually responsible for setting his bonus criteria, which he failed to do. (*Id.* at 7.)

### 1. Failure to Set Bonus Criteria

Teague is incorrect that HDP's failure to outline his bonus criteria in Schedule A, by itself, allows him to recover for breach of contract. The obligation to complete Schedule A fell on both Teague and HDP's owners. (*See* Contract at 10, § 7(c) (stating that "eligibility factors and criteria . . . will be determined by [Teague] *and* the Owners"; and "[i]t is the intent of the *Parties* to complete Schedule A . . . in the calendar year of 2015" (emphasis added)).) It is black-letter law that a plaintiff looking to recover for breach of contract must perform his own obligations. *Christopher v. West*, 409 Ill. 131, 136, 98 N.E.2d 722, 725 (Ill. 1951). Also, a plaintiff that insists on strict compliance may not argue that his own substantial performance was sufficient. *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 636 (7th Cir. 1992). Non-performance may be excused, however, when it is "prevented by the actions of the other party." *In re Edgewater Med. Ctr.*, 373 B.R. 845, 858 (Bankr. N.D. Ill. 2007); *accord Richelieu Foods, Inc. v. New Horizon Warehouse Distrib. Ctr., Inc.*, 67 F. Supp. 3d 903, 911–12 (N.D. Ill. 2014).

There is a genuine dispute of fact regarding whether Teague attempted to work with HDP to set his bonus criteria. Teague asserts that he "made several requests/demands for Bryant to complete 'Schedule A.'" (Teague Decl. ¶ 6.) However, Teague's assumption that his demands demonstrate HDP's breach is based on the flawed premise that HDP alone was responsible for setting his bonus criteria. While Bryant admits that neither he nor anyone at HDP ever proposed bonus eligibility factors, he also asserts that Teague never did either. (Bryant Aff. ¶¶ 3–4.) Thus, there is a question of fact whether Teague adequately performed regarding his effort to complete Schedule A. We accordingly deny summary judgment on Teague's breach of contract claim with respect to HDP's failure to complete Schedule A.

## 2.        Non-Payment of Bonuses

Because bonuses were discretionary, Teague is also incorrect that HDP's failure to pay him bonuses constitutes a breach.  The contract states that Teague "will be eligible to receive . . . an annual bonus."  (Contract at 10, § 7(c) (emphasis added).)  "Eligible" means "[f]it and proper to be selected or to receive a benefit."  Black's Law Dictionary (11th ed. 2019).  By that definition, eligibility does not equate to a guarantee.  *See Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015) ("Eligibility, of course, is no guarantee.  [Plaintiff] might very well be eligible for a bonus, but due to a host of factors, not receive one."); *Moore v. Nutrasweet Co.*, 836 F. Supp. 1387, 1404–05 (N.D. Ill. 1993) ("On being told that she was bonus-eligible, [Plaintiff] could reasonably have expected no more than that she would be an employee for whom a bonus was potentially available—that is, that she was qualified but not guaranteed to be chosen."); *Cresswell v. Bausch & Lomb, Inc.*, No. 85 C 5822, 1986 WL 13528, at *5 (N.D. Ill. Nov. 21, 1986) (letter stating that plaintiff "'would be eligible to participate in the . . . 'Sales Incentive Plan' . . . by no means guaranteed [plaintiff] a bonus").  Thus, HDP was not required to pay Teague a bonus each year of his employment.

While the payment of bonuses was discretionary, HDP was still required, as with Teague's salary reduction, to exercise its discretion in good faith.  *See Wilson*, 844 F.3d at 691; *Gore*, 376 Ill. App. 3d at 286, 876 N.E.2d at 161–62.  On this point, Defendants have presented evidence.  Bryant testified that he "frequently reviewed Teague's performance in his duties," expressed dissatisfaction to Teague regarding his performance, and "in April 2017, based upon review of his performance . . . determined that [Teague] did not deserve a . . . bonus."  (Bryant Aff. ¶¶ 2, 7, 17.)  Defendants have also submitted numerous emails wherein Bryant expressed his dissatisfaction with Teague's performance.  (Dkt. No. 63–1, Exs. A–B, D–E at 7–11, 15–19.)

Although Teague claims Bryant promised him a bonus of 40% of his salary in April 2016 if certain tasks were completed, (Teague Decl. ¶ 11), Bryant denies that he ever made such a promise. (Aff. of Bryant ¶ 28.)

In sum, we deny summary judgment on Teague's breach of contract claim with respect to HDP's non-payment of bonuses and failure to complete Schedule A because bonuses were discretionary, there is a factual dispute regarding the circumstances in which Teague attempted to work with HDP to determine his bonus eligibility criteria, and Defendants have presented evidence that they did in fact review Teague's performance and decided not to pay him any bonuses.

## C.    Promoted Interests

Teague also argues that Defendants breached the contract by not paying him a "Promoted Interest" in the Sierra Bloom and Winchester Projects. (Pl.'s SJ Mem. at 7–8.) In general terms, a promote is "an additional [financial] incentive for one . . . to see that a project succeeds." *Scion 2040 Managing Member LLC,* 2011 WL 6382904 at *2; *see also Veitch v. Virgin Mgmt. USA, Inc.*, No. 15 C 20989, 2015 WL 13808110, at *2 n.4 (S.D. Fla. Sept. 18, 2015) ("Essentially, the investors providing the cash funding demand a base return on their money . . . and once that base return has been achieved they share any returns above that with the active manager(s)."). Defendants do not dispute that Teague was never paid any kind of promoted interest in the Winchester or Sierra Bloom Projects. (*See* Bryant Aff. ¶ 28.) Rather, Defendants argue that Teague's claim fails because he has not shown that HDP was ever entitled to any promoted interests, which was a prerequisite to Teague's receipt of any such interests. (Am. Resp. at 8–9.)

Two conditions needed to be satisfied before Teague could receive any promoted interest compensation. First, HDP had to be entitled to a promoted interest. Section 9 of the contract states that the parties "acknowledge that the investment structure of certain projects pursued by [HDP] *may* contain a promoted interest." (Contract at 10, § 9 (emphasis added).) This language clearly indicates that not all HDP's projects had a promoted interest component. Second, Teague had to play a "direct managerial" role in a project in order to receive a promote. (*Id.* ("[T]o the extent [Teague] provides a direct managerial role in projects where a Promote exists, [he] will receive a percentage of the Promote.")

Teague has not presented sufficient evidence to show that both conditions were satisfied with respect to either the Winchester or Sierra Bloom Projects. Where the party seeking summary judgment ultimately bears the burden of proof at trial, it must, in addition to laying out the elements and citing supporting evidence, "demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the nonmovant on the claim." *Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015). A failure to meet this burden means summary judgment should be denied. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). Teague asserts that he had a direct managerial role in the Winchester Project (Teague Decl. ¶ 8), but there is no evidence that HDP itself had a promoted interest in that project. Regarding the Sierra Bloom Project, there is evidence that HDP had a promoted interest (*see* Contract at 11, § 9; Dkt. No. 48–8, Ex. B at 21–22), but no evidence that Teague ultimately played a direct managerial role.[4] Based on this lack of evidence,

---

[4] We also observe that promoted interest compensation is generally only obtained once certain criteria is satisfied. *See Veitch*, 2015 WL 13808110, at *2 (explaining that promoted interest compensation is generally paid after the investors make a base return). Thus, entitlement to promoted interest compensation is not always guaranteed even where a contract includes a promoted interest provision.

we cannot conclude that HDP breached the contract by not paying Teague a promoted interest in either the Winchester or Sierra Bloom Projects. *See Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance."). Thus, we deny summary judgment as to Teague's breach of contract claim with respect to HDP's non-payment of promoted interests in the Winchester and Sierra Bloom Projects.

### D. Teague's Out-of-Pocket Expenses

The final breach alleged by Teague is that Defendants failed to reimburse him for expenses "incurred in the course of his employment." (Pl.'s SJ Mem. 7–8.) Defendants do not respond to Teague's claim and the only evidence offered by Teague in support of his claim is his declaration that he is owed reimbursements. (Teague Decl. ¶ 25.)

The contract provides that reimbursements will be made for "reasonable out-of-pocket business expenses" provided that the expenses are properly accounted for. (Contract at 10, § 7(f).) Like the promoted interest compensation, Teague has failed to meet his initial burden with respect to this alleged breach. Teague's vague assertion that he is owed funds does not rule out the prospect of finding that Defendants did not breach. Without more we cannot say whether the expenses Teague complains of were "reasonable," actual business expenses, or that they were properly accounted for. Because Teague has not met his initial burden, we deny summary judgment on Teague's breach of contract claim with respect to his claimed out-of-pocket expenses.

## II.     ILLINOIS WAGE PAYMENT & COLLECTION ACT

Teague also brings a claim for violation of IWPCA and argues that the Defendants breaches entitle him to summary judgment on this claim.  (Pl.s' SJ Mem. at 9–11.)  The IWPCA "provide[s] employees with a cause of action for the timely and complete payment of earned wages or final compensation, without retaliation from employers."  *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016) (quoting *Byung Moo Soh v. Target Mktg. Sys.*, 353 Ill. App. 3d 126, 128, 817 N.E.2d 1105, 1107 (1st Dist. 2004)).  The IWPCA "does not provide an independent right to payment of wages and benefits; instead, it only enforces the terms of an existing contract or agreement."  *Wharton*, 912 F. Supp. 2d at 658.  Because Teague has, at this juncture, failed to show he is owed money under his employment contract, his IWPCA claim must fail.  *See Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 570 (7th Cir. 2016) ("[T]the IWPCA provides no substantive relief beyond what the underlying employment contract requires."); *Barker v. Quick Test, Inc.*, No. 13 C 4369, 2016 WL 1019708, at *11 (N.D. Ill. Mar. 15, 2016) (requiring that "[p]laintiffs . . . satisfy the Illinois standard for breach of contract to show an IWPCA violation"); *Gallardo v. Scott Byron & Co.*, No. 12 C 7202, 2014 WL 126085, at *14 (N.D. Ill. Jan. 14, 2014) ("Without a corresponding violation of an employment contract or agreement [there] cannot [be] a violation of the IWPCA.").  Thus, we deny Teague's motion for summary judgment with respect to his IWPCA claim.

## III.     DECLARATORY JUDGMENT

Teague's final claim is for declaratory judgment.  (Pl.'s SJ Mem. at 11–12.)  A declaratory judgment is a device that, under limited circumstances, allows a court to declare the rights and legal relations of parties.  *Med. Assur. Co. v. Hellman*, 610 F.3d 371, 377

(7th Cir. 2010).  Here Teague seeks to have the nonsolicitation and noncompetition clauses in his employment contract declared unenforceable.  (Compl. ¶¶ 47–56; Pl.'s SJ Mem. at 11–12.)  Section 12 of the contract restricts Teague from, among other things, selling competing products and services and soliciting competing products and services to certain customers for a period of two years.  (Contract at 12, § 12.)  However, these restrictions only apply if Teague was "terminated for 'cause'" or upon resignation.  (*Id.*)  The contract specifies that termination for cause includes termination for, among other things, "failure to meet [HDP's] legitimate expectations"; or "neglect of the duties [Teague] is required to perform under th[e] Agreement." (*Id.*)  Teague argues that he is not required to comply with the noncompetition obligations because (1) Defendants materially breached the contract, and (2) he was fired in retaliation for seeking to enforce HDP's payment obligations rather than for cause.  (Pl.'s SJ Mem. at 11–12; Reply at 11–12.)  Defendants respond that Teague's arguments fail because he has not demonstrated that Defendants breached the contract and ample evidence demonstrates that he was fired for cause.  (Am. Resp. at 10–12.)

We reject Teague's first argument that Defendants' breach means he can abandon his noncompetition obligations.  Not only has Teague failed to show that Defendants breached the contract, but he is also incorrect that Defendants' breach automatically alleviates him of his own contractual obligations.  "If a party to a contract breaks it, the other party can abandon the contract . . . and sue for damages, or it can continue with the contract and sue for damages.  But if it makes the latter election, it is bound to the obligations that the contract imposes on it." *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 832–33 (7th Cir. 2017) (citing *Emerald Invs. Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008)); *see also* 14 Williston on Contracts § 43:15 (4th ed.) ("[T]he

general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party . . . insists that the defaulting party continue to render future performance.").

Teague's second argument that he was fired in retaliation instead of for cause presents a genuine factual dispute. Teague has offered circumstantial evidence that he was fired due to his attempt to enforce his contractual rights. Bryant responded to Teague's October 6, 2017 letter outlining his grievances that Teague had "just fucked [himself]" and terminated him just one week later. (Dkt. No. 48–8, Ex. D at 28; *id.*, Ex. E at 30.) However, Defendants have offered evidence that Teague was not meeting HDP's legitimate expectations and was fired for his performance. (*See* Bryant Aff. ¶¶ 7–22.) Beyond Bryant's testimony, Defendants have submitted numerous emails sent to Teague before he sent his October 6 letter wherein Bryant complains to Teague about his performance. (*See* Dkt. No. 63–1, Exs. A–B, D–E at 7–11, 15–19.) Thus, whether Teague was fired for cause as defined by the contract is a question best resolved by a trier of fact. We accordingly deny Teague's motion for summary judgement as to his declaratory judgment claim.

## CONCLUSION

For the forgoing reasons, Teague's motion for summary judgment is denied. It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: August 22, 2019
       Chicago, Illinois