## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA TEAGUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 CV 601 |
| v. | ) | |
| | ) | Hon. Marvin E. Aspen |
| HEALTHCARE DEVELOPMENT | ) | |
| PARTNERS, LLC and TODD BRYANT, | ) | |
| Individually and as Agent of HEALTHCARE | ) | |
| DEVELOPMENT PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

MARVIN E. ASPEN, District Judge:

Defendants Healthcare Development Partners, LLC ("HDP") and Todd Bryant ("Bryant"; collectively, "Defendants") filed a motion for partial summary judgment under Federal Rule of Civil Procedure 56 on Counts I (Breach of Contract), II (Unjust Enrichment)[1], III (Fraudulent Misrepresentation), and IV (Illinois Wage Payment and Collection Act) of Plaintiff Joshua Teague's ("Plaintiff") Complaint (Dkt. No. 1). (Motion for Partial Summary Judgment ("MSJ") (Dkt No. 110).) Defendants also requested that we strike or disregard certain information contained in Plaintiff's Statement of Additional Material Facts (Dkt. No. 115) and documents attached thereto. (*See* Defendants' Reply in Support of Motion for Partial Summary Judgment ("Reply") (Dkt. No. 119) at 2–3.) For the reasons set forth below, we grant in part both the request to strike or disregard certain information and the Motion for Partial Summary Judgment.

---

[1] Plaintiff has since withdrawn this claim, so we do not analyze it here. (*See* Plaintiff's Response to Defendants' Motion for Partial Summary Judgment ("Resp.") (Dkt. No. 113) at 15.)

**DEFENDANTS' REQUEST TO STRIKE OR DISREGARD INFORMATION**

Before outlining the background facts, we address Defendants' request that we strike or disregard certain information. (Reply at 2–3.) Specifically, Defendants request that we strike or disregard "new 'facts'" offered by Plaintiff relating to Counts I and IV, as well as the affidavit of Aaron Kneas[2], which Defendants contend were never produced in discovery. (*Id.*) Defendants also assert that the "new 'facts'" submitted in connection with Counts I and IV are hearsay. (*Id.* at 2.)[3]

## I.    Legal Standard

"Motions to strike are disfavored unless they serve to help expedite proceedings and are generally not granted when ruling on motions for summary judgment." *Teague v. Healthcare Dev. Partners, LLC*, Case No. 18 C 601, 2019 WL 3973372, at *1 (N.D. Ill. Aug. 22, 2019) (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 429 F. Supp. 2d 1002, 1030 (C.D. Ill. 2006) and *RLJCS Enters., Inc. v. Prof'l Ben. Tr., Inc.*, 438 F. Supp. 2d 903, 906 (N.D. Ill. 2006)). In this district, a moving party must file a statement of undisputed facts to accompany its motion for summary judgment. L.R. 56.1(a). "If a factual statement is not supported by the material cited, it will not

---

[2] We assume that Defendants' use of the term "affidavit" was in error and that Defendants intended to challenge the Kneas declaration. (*See* Plaintiff's Statement of Additional Material Facts ("Pltf. SOF") (Dkt. No. 115) at Ex. 2.)

[3] Defendants characterize the "new 'facts'" as "self-serving." (*See* Reply at 2.) Self-serving statements can be used to defeat a motion for summary judgment. *See McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017) ("Our cases for at least the past fifteen years teach that [s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment. We have tried often to correct the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion.") (quotation marks and internal citations omitted); *see also Saccameno v. Ocwen Loan Servicing, LLC*, Case No. 15 C 1164, 2018 WL 1240347, at *5 (N.D. Ill. Mar. 9, 2018). Accordingly, it would be inappropriate for us to strike Plaintiff's statements on that basis, alone.

be credited." *Teague*, 2019 WL 3973372, at *1 (citing *Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003) and *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)).

A party opposing summary judgment may submit additional material facts in opposition to the motion. L.R. 56.1(b). Such facts will be deemed admitted unless controverted by the statement of the moving party. L.R. 56.1(e).

## A. Disclosure of Facts During Discovery

Federal Rule of Civil Procedure 26 requires that a party provide other parties with certain information concerning individuals who are likely to have discoverable information that the disclosing party may use to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(i)). "[I]f a party 'fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *Paldo Sign and Display Co. v. Unified Mktg., LLC*, No. 13 C 1896, 2017 WL 951313, at *2 (N.D. Ill. Mar. 10, 2017) (quoting Fed. R. Civ. P. 37(c)(1)). "Preclusion is automatic and mandatory unless the offending party can establish that its violation of Rule 26(a)(2) was either justified or harmless. *Id*. (internal quotation marks and citations omitted).

## B. Hearsay

Evidence relied upon in opposition to a motion for summary judgment "must be competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996); *Knuth v. Wexford Health Sources, Inc.*, 15 C 2666, 2018 WL 10799157, at *11 (N.D. Ill. Mar. 12, 2018). "[A] party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment." *Bombard*, 92 F.3d at 562 (internal citations omitted).

## II.    Analysis

### A.  Form of Defendants' Requests

The proper approach for objecting to a statement of additional facts is to respond to each numbered paragraph with specific evidence controverting the content contained therein.  *See Magee v. McDonald's Corp.*, Case No. 16-CV-5652, 2019 WL 10447014, at *3 (N.D. Ill. Mar. 28, 2019).  Defendants did not do so here.  Nor did they file a motion to strike.  Instead, they devoted two sentences of their Reply to the requests that we strike or disregard certain content submitted by Plaintiff in opposition to Defendants' Partial Motion for Summary Judgment. (Reply at 2–3.)  They neither specify which facts they consider to be "new" and would like us to disregard, nor cite case law in support of their requests.  (*Id.*)

We are not required to scour the parties' submissions to "piece together appropriate arguments" or otherwise "make the lawyer's case."  *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal quotation marks and citation omitted); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Defendants' failure to properly challenge Plaintiff's Statement of Additional Facts is grounds for denying their requests.  *See Magee*, 2019 WL 10447014, at *3 ("If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted.") (internal citation omitted)*; see also World Impressions, Inc. v. McDonald's Corp.*, 235 F. Supp. 2d 831, 838 (N.D. Ill. 2002) (deeming facts to be admitted where party failed to respond to a statement of additional facts).

Nevertheless, to the extent we can make reasonable assumptions about which statements Defendants are challenging, we will consider their requests.  Based on the briefing, we assume

that Defendants are objecting to: (1) statements appearing in paragraphs 60–65 of Plaintiff's Statement of Additional Facts; (2) the Kneas declaration; and (3) facts derived from the Kneas declaration. (Reply at 2–3; Dkt. No. 121 at 1–2; Dkt. No. 124 at 3.) For the reasons set forth below, we grant the requests to the extent they relate to statements appearing in paragraphs 63–65 of Plaintiff's Statement of Additional Facts but deny them as to statements appearing in paragraphs 60-62 of Plaintiff's Statement of Additional Facts, the Kneas declaration, and facts derived from that declaration.[4]

## B. Facts Not Disclosed in Discovery

This challenge appears to be directed at: (1) statements appearing in paragraphs 60–65 of Plaintiff's Statement of Additional Facts, which are supported by Plaintiff's declaration; (2) the declaration of Aaron Kneas; and (3) facts derived from the Kneas declaration. (Reply at 2–3; Dkt. No. 121 at 3 (Aaron Kneas), Dkt. No. 124 at 3 (statements appearing in ¶¶ 60–65).) We will consider each of these objections in turn.

Statements appearing in paragraphs 60–65 of Plaintiff's Statement of Additional Facts relate to the reduction in salary, and the eventual termination, of two former HDP employees: Plaintiff and Tom Eagley. (Pltf. SOF ¶¶ 60–65.) Plaintiff contends that he learned all of these facts from Bryant. (Dkt. No. 124 at 5–6.) He claims that Defendants had notice that the facts in paragraphs 60–65 would be asserted because he disclosed Tom Eagley as a potential witness with knowledge of: "Todd Bryant's business practices, **specifically with regard to Bryant's repeated failure to fully compensate employees**." (*Id.* at 4 (emphasis in original).) He also

---

[4] To the extent that Defendants are seeking to strike any other material, their requests are denied for failure to properly develop an argument. *See BI3, Inc. v. Hamor*, No. 08 CV 2384, 2011 WL 1231156, at *2 (N.D. Ill. Mar. 30, 2011) (observing that a request to strike would only be factored into the court's analysis where parties had "taken the time to develop an evidentiary argument").

disclosed himself as a witness in his initial disclosures. (Dkt. No. 121, Ex. A.) According to Plaintiff, Defendants simply chose not to depose either him or Mr. Eagley. (Dkt. No. 124 at 4.)

Typically, courts will not exclude declarations or affidavits submitted in connection with summary judgment briefing where a witness has been properly disclosed, and the party seeking to strike the statement either failed or chose not, to take discovery from the witness. *See, e.g., Krawczyk v. Centurion Capital Corp.*, No. 06-C-6273, 2009 WL 395458, *6–7 (N.D. Ill. Feb. 18, 2009) (denying Plaintiff's motion to strike where "[a]ny prejudice to Plaintiff resulted from not conducting his own discovery with respect to Defendants' witnesses").

The fact that Plaintiff disclosed Tom Eagley as a potential witness is not relevant here because Tom Eagley has not submitted a declaration or affidavit in support of paragraphs 60–65 of Plaintiff's Statement of Additional Facts. The only support for those statements is Plaintiff's own declaration. (*See* Pltf. SOF ¶¶ 60–65.) Therefore, the relevant inquiry is whether Plaintiff disclosed that he had knowledge of the facts contained in paragraphs 60–65. *See* Fed. R. Civ. P. 26(a)(1)(A)(i).

In Plaintiff's initial disclosures, he states that he may testify regarding:

> the allegations in his Complaint and his defense to HDP's Counterclaim, including, but not limited to, his employment with Defendants, the facts and circumstances which gave rise to Plaintiff entering into his Employment Agreement with Defendants, the terms and conditions of that Employment Agreement, his performance of his duties and obligations under that Employment Agreement, and Defendants' multiple breaches of that Employment Agreement.

(Dkt. No. 121, Ex. A.)  In other words, Plaintiff states that he has knowledge about "allegations in his Complaint," his defenses, and topics relating to his employment, but not Tom Eagley's salary reduction and eventual termination.[5]  (*See* Dkt. No. 121, Ex. A.)

To the extent that the allegations in paragraphs 60–65 relate to Mr. Eagley and not Plaintiff, we will disregard them.  Plaintiff did not adequately disclose his knowledge of Mr. Eagley's employment situation in discovery.  *See Paldo Sign*, 2017 WL 951313, at *2.  Nor has he attempted to argue that the omission was justified or harmless.[6]

A similar analysis is appropriate for the declaration of Mr. Kneas, who was disclosed as:

> the Chief Financial Officer of Vizion Health, LLC.  He is expected to have knowledge and information regarding the allegations contained in HDP's counterclaim[7], efforts made by Plaintiff on behalf of HDP with regard to Vizion Health, and Plaintiff's working arrangement with Vizion Health after his termination from HDP.

(Dkt. No. 121, Ex. A.)  According to Plaintiff, although Plaintiff properly disclosed Mr. Kneas as a witness, Defendants never took discovery from him.  (Dkt. No. 121 at 3.)

Kneas' declaration describes the nature of Vizion Health, LLC's ("Vizion Health") business, dealings with HDP, and arrangement with S4 Ventures, LLC ("S4 Ventures"), among

---

[5] Plaintiff might argue that his testimony concerning Mr. Eagley relates to the "allegations in his Complaint," but this would be a stretch.  The Complaint makes no mention of Mr. Eagley, in either specific or general terms.  (*See generally* Complaint.)

[6] Statements pertaining to Mr. Eagley's employment are not central to our resolution of the motion because he is not a named plaintiff, and other evidence in the record creates a triable issue of fact as to whether Defendants acted in good faith when they reduced Plaintiff's salary and terminated him.  Stated differently, we would have reached the same result regardless of the inclusion or exclusion of statements pertaining to Mr. Eagley.

[7] HDP's Counterclaim contains counts for breach of contract and breach of fiduciary duty.  (*See* Counterclaim (Dkt. No. 15).)  HDP alleged, among other things, that Plaintiff breached his Employment Agreement by diverting a prospective tenant for the Winchester Project from HDP to S4 Ventures and competing with HDP.  (Counterclaim ¶¶ 7–30.)  The parties subsequently stipulated that the Counterclaim would be dismissed without prejudice.  (Dkt. No. 44.)

other topics.  (*See* Pltf. SOF, Ex. 2.)  It is used as support for related facts in Plaintiff's Statement

of Additional Facts.  (*See* Pltf. SOF ¶¶ 76–86.)  Plaintiff's initial disclosures adequately apprised

Defendants of Mr. Kneas' knowledge concerning these topics.  Thus, Mr. Kneas' declaration,

and the portion of Plaintiff's Statement of Additional Facts relating thereto, will not be stricken

or disregarded.

### C.  Facts Based on Hearsay

We presume that Defendants' hearsay objection relates to the statements in paragraphs

60–65 of Plaintiff's Statement of Additional Facts discussed above.  (*See* Reply 2–3; Dkt. No.

124 at 5.)

Plaintiff argues that these facts are not inadmissible hearsay because Bryant admitted

them to Plaintiff, and they are being used against Bryant.  (Dkt. No. 124 at 5–6.)  "Rule

801(d)(2)(A) provides that a statement is not hearsay if it 'is offered against an opposing party

and … was made by the party in an individual or representative capacity.'"  *Jordan v. Binns*, 712

F.3d 1123, 1128 (7th Cir. 2013) (quoting F.R.E. 801(d)(2)(A)).[8]  Such is the case here.

Accordingly, the statements in paragraphs 60–65 of Plaintiff's Statement of Additional Facts are

not hearsay and will not be stricken on that basis.

### DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

### I.  Background

### A.  Prior Opinion

This is the second motion for summary judgment filed in this case.  On April 19, 2019,

Plaintiff moved for summary judgment on Counts I (Breach of Contract), IV (Illinois Wage

---

[8] Federal Rule of Evidence 804(b) is inapplicable because there has been no showing that the
declarant (Bryant) is unavailable.

Payment and Collection Act), and V (Declaratory Judgment) of the Complaint. (Dkt. No. 46.) That motion was denied. *Teague*, 2019 WL 3973372, at *1.

## B. The Instant Motion

The facts outlined below are taken from the parties' Local Rule 56.1 statements, Plaintiff's response to Defendants' Local Rule 56.1 statement, and the materials cited therein, and are undisputed unless otherwise noted.

### i. Agreement Between the Parties

HDP is in the business of real estate development and property management. (Defendants' FRCP 56.1 Statement of Material Undisputed Facts ("Def. SOF") (Dkt. No. 111) ¶ 2.) On or around July 3, 2015, HDP and Plaintiff entered into an employment agreement ("Employment Agreement"), which Bryant and executed on HDP's behalf. (Def. SOF ¶¶ 1–2; Pltf. SOF at ¶¶ 1–2; Complaint, Ex. A ("Employment Agreement") at 10.)

Plaintiff agreed to manage or assist in managing real estate development projects around the United States in exchange for certain benefits, including, as relevant here, a base salary; the possibility of incentive compensation based on his performance; compensation for certain projects in which HDP had a "promoted interest" and Plaintiff played a "direct managerial role;" and reimbursement for certain business expenses. (*See* Employment Agreement at 3–5.) Plaintiff's "Base Salary" was set at $145,000 and was "subject to review from time to time and no less often than annually." (Pltf. SOF ¶¶ 4–5; Employment Agreement at 4.)

### a. Bonus Compensation

Bonus compensation was available annually based on certain criteria not set forth by the parties. (Def. SOF ¶¶ 5–6.) The parties agree that HDP never proposed such criteria but disagree as to whether Plaintiff did so. (*See* Plaintiff's Response to Defendants' FRCP 56.1

Statement of Facts ("Pltf. Resp. Def. SOF") (Dkt. No. 114) at ¶¶ 7–8.)  Plaintiff claims that he made a series of "requests/demands" for Bryant to complete Schedule A to the Employment Agreement and that Bryant refused.  (*See, e.g.*, Pltf. SOF, Ex. 1 at ¶¶ 16–18.)

Plaintiff asserts that the parties had mutual understandings concerning payment of his annual bonus, which were ancillary to the Employment Agreement.  (*See, e.g.*, Pltf. SOF ¶¶ 15–16.)  For example, though the Employment Agreement stated that Plaintiff's annual bonus would not be prorated for performance in 2015, Plaintiff claims that "[i]t was understood by the Parties to the Employment Agreement" that Plaintiff "would be eligible to receive the full 20% of his full salary of $145,000 in April 2016, despite only working from July 2015 to April 2016 during the first contractual year."  (*Id*. ¶ 15.)  Accordingly, Plaintiff expected to receive a lump sum bonus of up to $29,000 in April 2016.  (*Id*. ¶ 16.)

Plaintiff asserts that after Defendants failed to pay him the anticipated bonus in April 2016, Bryant verbally promised to increase Plaintiff's annual bonus for fiscal year 2015–16 to 40% of his annual salary if Plaintiff agreed to wait for payment until two to additional items were completed: (1) Valley Health lease renewal for Winchester, Virginia; and (2) substantive agreement with Universal Health Services in Scottsdale, Arizona.  (*Id*. ¶¶ 22–23.)

According to Plaintiff, both items were completed by the end of 2016, yet Bryant refused to pay Plaintiff the amount he had previously promised ($58,000) when Plaintiff raised the issue with him in December 2016.  (*Id*. ¶¶ 26–28.)

**b.  Promoted Interest Compensation**

Promoted interest compensation was available for certain projects where: (1) HDP had a promoted interest and (2) Plaintiff provided a "direct managerial role."  (Employment Agreement at 4–5.)  The Employment Agreement specified that in such cases, Plaintiff "will

10

receive a percentage of the Promote within the range of 10-35% as mutually determined by the Parties on a case-by-case basis." (*Id*. at 5.) The Employment Agreement contained separate terms for a project based in Phoenix, Arizona, known as the "Sierra Bloom Project." (*Id*.) The Employment Agreement specified that Plaintiff's "percentage of any Promote related to the Sierra Bloom campus in Phoenix, Arizona is anticipated to be within the range of 5-10% as mutually determined by the Parties." (*Id*.)

Plaintiff claims that he had a conversation with Bryant in January 2016, in which Bryant promised Plaintiff a 10% ownership stake in the Winchester Project under Sections 7, 8, and 9 of the Employment Agreement. (Pltf. SOF ¶ 29.) Thereafter, on May 27, 2017, Bryant purportedly promised Plaintiff a 5% ownership stake in the Sierra Bloom Project in accordance with the same provisions of the Employment Agreement. (*Id*. ¶ 30.) Plaintiff claims that Bryant confirmed the promise that he made concerning Winchester Project on January 18, 2017. (*Id*. ¶ 33 (citing Pltf. SOF, Ex. 1 at Ex. B).) On that date, Bryant purportedly told Plaintiff that the "financial rewards to [Plaintiff] are significant" if Plaintiff would "make personal sacrifices to get [them] over the hump." (*Id*.) Then, on April 12, 2017, Bryant supposedly confirmed Plaintiff's expectation that he would receive an ownership stake in the Winchester Project when Bryant acknowledged that Plaintiff expected to be a "partner." (*Id*. ¶ 34 (citing Pltf. SOF, Ex. 1 at Ex. E).) Defendants dispute that Plaintiff is entitled to a promoted interest in connection with these projects but did not respond to any of these facts directly. (*See* Reply at 6–7.)

### c. Reimbursement of Business Expenses

The Employment Agreement also contains a provision relating to the reimbursement of business expenses. (Employment Agreement at 4.) Specifically, HDP agreed to reimburse Plaintiff "for all reasonable out-of-pocket business expenses incurred by the Employee on behalf

11

of the Company. . . provided that [Plaintiff] properly accounts to the Company for all such expenses. . . ." (*Id.*) Plaintiff contends that in December 2016 and October 2017, he requested reimbursement from HDP for more than $3,000 in out-of-pocket business expenses, but he was never repaid. (Pltf. SOF ¶ 67.)

### d. Plaintiff's Time at HDP

Plaintiff worked for HDP from July 3, 2015, through October 13, 2017, at which point he was terminated. (Def. SOF ¶¶ 3, 27; Pltf. SOF ¶ 69.) The parties dispute the reason for the termination, with Defendants claiming that it was due to poor performance and Plaintiff asserting that it was in retaliation for his complaints about compensation and the company's failure to reimburse him for business expenses. (Pltf. Resp. Def. SOF ¶ 27.)

Defendants state that HDP's Owners, including Bryant, "frequently" reviewed Plaintiff's performance. (Def. SOF ¶ 12.) However, Plaintiff denies receiving any performance reviews or formal evaluations of his performance. (Pltf. SOF ¶ 44.)

Throughout 2017, Bryant complained to Plaintiff about Plaintiff's job performance. (*See* Def. SOF ¶¶ 13, 16, 20, 21, Ex. 1 at Exs. A, B, D, E.) For example, on January 18, 2017, Bryant sent Plaintiff an email, in which he stated, among other things:

> We need to do whatever it takes to push the projects forward. We have no revenue and very little sense of urgency. … I understand you want to maintain all the activities that would do during normal times at work but these are not normal times and I will not go down when there is so much upside. I need a bigger effort and am asking for the next 90 days for you to make personal sacrifices to get us over the hump. … I know Nicole has been waiting on a LOI for CA for 2 weeks and nothing. Please get revenue in the door and deals converted. Call Randy this morning. Etc.

(Def. SOF, Ex. 1 at Ex. A.) Then, on April 12, 2017, Bryant sent Plaintiff an email questioning why Plaintiff would be out of town for a week in April. (Def. SOF, Ex. 1 at Ex. B.) Bryant told Plaintiff:

12

> This is a real critical time. You didn't even ask for time off and you said I should trust your judgement [sic]. I don't see how you can disappear for a week now. With out Winchester fixed I am very uncomfortable with you taking any time off. You are demonstrating a lack of judgement [sic] during a crisis. How can you ask from me to be a partner and then take off?

(*Id*.) Bryant later added, "You have to be joking. You need to be living in Winchester. You are the single point of responsibility and you are leaving again. … You have put me in a horrendous situation. Fix it now." (*Id*.)

Bryant sent Plaintiff additional emails in May 2017 that chastised Plaintiff for his performance. (Def. SOF, Ex. 1 at Exs. D, E.) On May 21, 2017, he told Plaintiff:

> I am sick of your bullshit. You have continually let me down. I listen to my partners complain about you and your lack of fucking results. You are responsible for total production yet we have none. Where are the numbers on any of these projects? No budgets, Pro Formas . You need Barry to do your job?

(Def. SOF, Ex. 1 at Ex. D.) Later that night, he criticized Plaintiff for reaching out to someone else named "Jerry"—presumably Jerry Nudo—regarding Plaintiff's interest in one of the projects. (*See* Def. SOF, Ex. 1 at Ex. E.)

Plaintiff disputes that these exchanges—and Defendants' characterization of them—fairly portray the state of affairs. (Pltf. Resp. Def. SOF ¶¶ 20–21.) In the case of the first May thread, Plaintiff claims that Bryant subsequently apologized. (*Id*. ¶ 20.) In the case of the second, Plaintiff asserts that he was merely requesting confirmation from Bryant and HDP's other Owners that they would honor an earlier agreement that he receive a 5% ownership interest in that project. (*Id*. ¶ 21.)

Defendants also claim that in 2017, HDP lost exclusive negotiating rights with a client as a result of Plaintiff's poor performance. (Def. SOF ¶ 19.) In support of their argument, they provide a copy of an April 19, 2017, email from Harvey Billing. (*See* Def. SOF, Ex. 1 at Ex. C.)

Plaintiff disagrees with Defendants' characterization of that email, including that Plaintiff was the cause of any delays or inaccurately prepared any proposals. (Pltf. Resp. Def. SOF ¶ 19.)

In August 2017, Bryant and Talbert reduced Plaintiff's salary by 50%. (Def. SOF ¶ 24.) Defendants claim that Plaintiff's salary reduction was justified due to Plaintiff's "poor performance, and the fact that HDP had either lost multiple agreements or become embroiled in litigation" on Plaintiff's projects. (*Id.*) Plaintiff agrees that his salary was reduced but denies that it was due to his performance. (*See* Pltf. Resp. Def. SOF ¶ 24.) Instead, Plaintiff claims that the unilateral salary reduction was part of a pattern of behavior in which Defendants ceased paying his full salary whenever they had financial difficulties. (*Id.*; Pltf. SOF ¶¶ 52–62.)

According to Plaintiff, in late 2016, Bryant began paying him only half of his Base Salary, "citing financial difficulties due to his (Bryant's) divorce and multiple lawsuits against Bryant and his other business entities unrelated to HDP." (Pltf. SOF ¶ 60.) Defendants eventually caught up on past due salary payments in February 2017. (*Id.* ¶ 62.)

On October 6, 2017, Plaintiff sent Bryant a letter setting forth his grievances with the company, including not being paid his full salary or incentive compensation and not being reimbursed for business expenses. (Pltf. SOF, Ex. 1 at Ex. G.) Later that day, Bryant responded to the letter via email, exclaiming that Plaintiff had "just fucked [himself]." (Pltf. SOF, Ex. 1 at Ex. H.)

Four days later, on October 10, 2017, Plaintiff formed his own company, S4 Ventures LLC ("S4 Ventures"). (Def. SOF ¶¶ 28.) According to a document produced by Plaintiff and attached to Defendants' Statement of Facts, S4 Ventures' "core competency is management of the real estate development process from initial site identification through completion of construction." (*See* Def. SOF, Ex. 5.)

14

On October 11, 2017, Plaintiff executed an agreement entitled, "Proposed Development Management Program" on behalf of S4 Ventures. (Pltf. Resp. Def. SOF ¶ 32.) The counterparty to that agreement was Vizion Health. (*Id.*) The agreement states that Vizion Health would like to retain S4 Ventures "for consulting services in relation to project analysis, project development, and procurement of capital" for two projects. (Pltf. SOF, Ex. 5.) The names of those projects have been redacted. (*Id.*)

According to Defendants, "Vizion Health was a contact and customer of HDP involved in the development of a healthcare facility in California," and Plaintiff "was in contact with Vizion on behalf of HDP in February 2017." (Def. SOF ¶ 33.) Plaintiff admits that Vizion Health was involved in a development project with HDP in California and that he was in contact with Vizion Health on behalf of HDP in February 2017. (Pltf. Resp. Def. SOF ¶ 33.) However, he denies that Vizion Health was HDP's customer or that he "engage[d] with Vizion in competition with or to the detriment of HDP." (*See* Pltf. SOF ¶ 86, Ex. 2 at ¶ 6 ("Vizion has no current or past contracts or direct business dealings with HDP.").)

Defendants terminated Plaintiff on October 13, 2017, citing Plaintiff's "gross mismanagement in the performance of [his] duties." (Pltf. SOF, Ex. 1 at Ex. I.) Defendants claim that shortly after Plaintiff's termination, he "solicited investors in the Winchester Project, offering to produce potential tenants for the property." (Def. SOF ¶ 29.)[9] Plaintiff disputes the

---

[9] Defendants cite Exhibit 5 to their statement of facts (Def. SOF, Ex. 5) in support of this statement. Exhibit 5 is an agreement between S4 Ventures, LLC and Vizion Health, and does not mention investment in the Winchester Project or an offer to produce tenants for the property. (*See* Def. SOF, Ex. 5.) Plaintiff seems to assume that Defendants intended to refer to Exhibit 4 (Def. SOF, Ex. 4 at 4), a letter from S4 Ventures, LLC to Gerald Nudo, as he responds by admitting that on October 27, 2017, he sent a letter on behalf of S4 Ventures to Gerald Nudo and that the letter "makes reference to 'the property located at 333 W. Cork Street, Winchester, VA.'" (*See* Pltf. Resp. Def. SOF ¶ 29.) The assumption makes sense based on the content in the exhibits as well as the dates—Exhibit 4 post-dates Plaintiff's termination, and Exhibit 5 predates

reason for his termination and denies that any of his alleged breaches of the Employment

Agreement are "material to Defendants' Motion for Summary Judgment." (Pltf. Resp. Def. SOF

¶¶ 27–33.)

## II. Legal Standard

Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to

identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).

"A party that does not bear the burden of persuasion may move for summary judgment

'by showing—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir.

2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks

omitted)). "If, after an adequate opportunity for discovery, 'the non-movant does not come

forward with evidence that would reasonably permit the finder of fact to find in her favor on a

material question, then the court *must* enter summary judgment against her.'" *Modrowski*, 712

it. (*See* Def. SOF, Exs. 4, 5.) For the purpose of this motion, we will make the same
assumption.

F.3d at 1167 (quoting *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (emphasis in original) (internal citations omitted)).

In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## III.  Analysis

### A.  Count I (Breach of Contract)

"[T]o prevail on a breach of contract claim the plaintiff must show: (1) the existence of a valid and enforceable contract, (2) [the plaintiff] substantially performed the contract, (3) the defendant breached that contract, and (4) damages resulted from the alleged breach of contract." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018).

Plaintiff alleges that Defendants breached the Employment Agreement by failing to: (1) pay a portion of his wages for the period August 16, 2017, through October 13, 2017; (2) cooperate with Plaintiff to establish bonus criteria and pay annual bonuses for fiscal years 2015-2016, 2016-2017, and 2017-2018; (3) pay him for his ownership interests in the Winchester and Sierra Bloom Projects of 10% and 5%, respectively; and (4) reimburse him for certain out-of-pocket business expenses.  (Complaint ¶¶ 13–16, 19–23.)

#### i.  Plaintiff's Alleged Breach of the Employment Agreement

Defendants argue that Plaintiff cannot prevail on his breach of contract claim under any theory because he did not satisfy his obligations under Sections 12 and 13 of the Employment Agreement.  (MSJ at 6–7.)  Under Illinois law, a plaintiff must perform his own obligations to sustain a claim for breach of contract.  *See Teague*, 2019 WL 3973372, at *6 (citing *Christopher v. West*, 409 Ill. 131, 136, 98 N.E.2d 722, 725 (Ill. 1951)).

17

### a. Section 12

Section 12 of the Employment Agreement provides in relevant part[10]:

> **<u>Nonsolicitation and Noncompetition</u>**.    During Employee's employment with the Company and for the length of time identified below, the following provisions will apply, if: (1) Employee is terminated for "cause" as that term is defined in this Agreement; or (2) Employee resigns for any reason.
>
> > a) <u>Limited Restriction on Selling a Competing Product/Service</u>.    For two (2) years beginning on the Separation Date, Employee shall not sell or solicit the sale of a Competing Product/Service to a Restricted Customer.

(Employment Agreement at 6.)  "Restricted Customer" is defined as:

> [A]ny customer of the Company to which the Employee (whether individually or as part of a team), or one or more individuals or Company business units supervised, assisted, managed or directed by Employee, sells or provides products or services on behalf of the Company during the twelve (12) month period immediately preceding the Separation Date.

(*Id*. at 2.)  "Competing Product/Service" is defined as:

> [A]ny service, technology, product or concept that is the same or similar to, competes with, may be substituted for, replaces, resembles, performs any of the same or similar functions, is used or intended to be used for any of the same purposes as a Company Service.  Competing Product/Service includes, but is not limited to, any healthcare real estate service involving development, acquisitions, architecture, and/or engineering.    Competing Product/Service does not include working for a hospital or healthcare system, nor does it include consulting services (excluding development, acquisitions, architecture, and/or engineering services) provided by brokerage or corporate service/consulting organizations such as CBRE, JLL, Newmark Grubb Knight Frank, or other similar companies.

(*Id*. at 1–2.)

---

[10] Section 12 contains additional subsections, but Defendants have only made specific arguments regarding subsection (a).  (*See* MSJ at 6–7.)  Accordingly, our analysis is limited to that subsection.

Defendants argue that Plaintiff breached this provision when he formed S4 Ventures while still employed by HDP and when he solicited business from Vizion Health. (MSJ at 6–7.)[11]

There is no dispute that Plaintiff formed S4 Ventures and executed an agreement entitled, "Proposed Development Management Program" with Vizion Health on behalf of S4 Ventures prior to his termination. (Pltf. Resp. Def. SOF ¶¶ 28, 32.) However, there is a triable issue of fact as to whether Plaintiff was terminated "for cause" and Vizion Health was a "Restricted Customer."[12] Plaintiff has provided some evidence that he was not terminated "for cause" (*see, e.g.,* Pltf. SOF ¶¶ 66–70) and that Vizion Health is not, and never has been, a client of HDP (*see, e.g.*, Pltf. SOF ¶ 78). Accordingly, we cannot grant summary judgment based on Plaintiff's alleged breach of Section 12 of the Employment Agreement.

---

[11] In the "Statement of Facts" section of their Motion for Summary Judgment, Defendants mention that on October 27, 2017, Plaintiff also contacted "Bryant's investment partner soliciting services in direct violation of the non-compete provisions set forth in Sections 12 and 13" of the Employment Agreement. (MSJ at 5.) They provide no further explanation of this theory in their briefing. (*See generally* MSJ, Reply.) As discussed above, in footnote 9, we assume that Defendants are referring to a letter from Plaintiff to Gerald Nudo. According to Plaintiff, Gerald or "Jerry" Nudo is one of HDP's Owners. (Pltf. SOF ¶ 57.) Defendants have not disputed this fact. (*See generally* MSJ, Reply.) Given Mr. Nudo's relationship with HDP, we are hard-pressed to understand how the alleged solicitation of services by Plaintiff from Mr. Nudo could possibly violate either Section 12 or Section 13 of the Employment Agreement. Since Defendants have not explained their theory, we have no way to evaluate it, and will, therefore, disregard it. *See Little*, 71 F.3d at 641 (7th Cir. 1995).

[12] If Plaintiff was not terminated "for cause," or Vizion Health was not a "Restricted Customer," then Plaintiff could not have breached Section 12(a). The restrictions set forth in Section 12 apply "if: 1) Employee is terminated for 'cause' as that term is defined in this Agreement; or (2) Employee resigns for any reason." (Employment Agreement at 6.) None of the parties argues that Plaintiff resigned. Accordingly, the provisions in Section 12 would only be applicable if Plaintiff were terminated for cause. Likewise, in order to violate Section 12(a), Plaintiff would have had to solicit or sell certain products or services to "Restricted Customers," as that term is defined in the Employment Agreement. (*Id*.) Section 12(a) did not prohibit the solicitation or sale of products or services to anyone other than a "Restricted Customer." (*Id*.)

### b. Section 13

Defendants argue that the same conduct also violates Section 13 of the Employment

Agreement. (MSJ at 6–7.) Section 13 of the Employment Agreement states:

> **Duty of Loyalty**. During employment with Company, Employee
> shall owe Company an undivided duty of loyalty, and shall take no
> action adverse to that duty of loyalty. Employee's duty of loyalty to
> Company includes but is not limited to a duty to promptly disclose
> to Company any information that might cause Company to take or
> refrain from taking any action, or which otherwise might cause the
> Company to alter its behavior. Without limiting the generality of
> the foregoing, Employee shall promptly notify Company at any time
> that Employee decides to terminate employment with Company or
> enter into competition with Company, as Company may decide at
> such time to limit, suspend, or terminate Employee's employment
> or access to one or more of Company's Confidential Information,
> Trade Secrets, or customer relationships.

(Employment Agreement at 6–7.)

Here, too, there is a triable issue of fact that precludes summary judgment. Defendants

argue that Plaintiff breached his duty of loyalty to HDP when he offered competing healthcare

development services to Vizion Health while still employed by HDP. (MSJ at 7.) There is some

support for this proposition. The parties agree that HDP is in the business of real estate

development and property management (*see* Pltf. Resp. Def. SOF ¶ 2), and there is some

evidence that S4 Ventures occupies the same space (*see* Def SOF, Ex. 5 at 3 ("S4's core

competency is management of the real estate development process....")). Two days before

Plaintiff was terminated by HDP, he executed an agreement with Vizion Health, on behalf of S4

Ventures, concerning a development management program for two properties. (*Id*. at 3–6.)

On the other hand, Plaintiff has put forth some evidence that S4 Ventures did not

compete with HDP and that the relationship between S4 Ventures and Vizion Health did not

otherwise affect HDP's business. (*See* Pltf. SOF ¶¶ 76–86.) For example, Plaintiff submitted a

declaration from Aaron Kneas in which Mr. Kneas attested to the fact that Plaintiff has never

20

"engaged with Vizion in competition with or to the detriment of HDP." (Pltf. SOF, Ex. 2 at

¶ 23.) Accordingly, there are issues of material fact that cannot be resolved at this stage.[13]

### ii. Salary Reduction

In the prior round of briefing, we concluded that "HDP had the contractual right to

review and reduce [Plaintiff's] salary"[14] and that Defendants had "presented some evidence that

their decision to reduce [Plaintiff's] salary was not arbitrary," such that they had done enough to

"stave off summary judgment." *Teague*, 2019 WL 3973372, at *5–6. The only remaining

question was whether Defendants had acted in good faith when they reduced Plaintiff's salary.

*Id*. at *6.

Defendants argue that there is no question of material fact that they acted in good faith.

(MSJ at 6.) According to Defendants, the documentary evidence, as well as Bryant's affidavit,

demonstrate that HDP was disassatisfied with Plaintiff for months, and therefore, was justified in

reducing his salary. (*Id*.) Although Defendants put forth some evidence that they acted in good

faith, Plaintiff put forth some evidence that they did not. For example, according to Plaintiff,

---

[13] Defendants claim that in Plaintiff's answers to Defendants' interrogatories, Plaintiff "admitted he violated his duty of loyalty under the Employment Agreement by forming S4 Ventures, LLC, while employed by HDP." (MSJ at 6.) However, Defendants failed to attach a copy of Plaintiff's answers to their briefing. Accordingly, we are unable to verify whether this is true.

[14] It seems that Plaintiff would like us to revisit this conclusion when he argues that the salary provision is ambiguous and that we should consider extrinsic evidence to interpret it. (*See* Resp. at 10.) "A contract is ambiguous if its terms may reasonably be interpreted in more than one way, but it is not rendered ambiguous simply because the parties disagree upon its proper construction." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009) (internal citations omitted); *Continental Cas. Co. v. MidStates Reinsurance Corp.*, 2014 IL App (1st) 133090, ¶ 13, 24 N.E.3d 122 (Ill. App. Ct. 2014). We conducted an in-depth analysis of that provision in our prior opinion and did not conclude that extrinsic evidence concerning the parties' intentions was necessary to understand it. *See Teague*, 2019 WL 3973372, at *5–6. We will not revisit that conclusion here. *See Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 455 (2015) ("*Stare decisis*—in English, the idea that today's Court should stand by yesterday's decisions—is a foundation stone of the rule of law.") (internal quotation marks and citation omitted).

Bryant admitted that HDP withheld payment from Plaintiff due to Bryant's financial troubles. (Pltf. SOF ¶ 60.)  Additionally, there is some evidence that problems arose with the Sierra Bloom Project as a result of Bryant's conduct, not Plaintiff's  (Pltf. SOF ¶ 35–42.)  These and other facts are sufficient to create a triable issue of material fact as to this theory of liability.

### iii.    Non-Payment of Bonuses

In the prior round of briefing, Plaintiff argued that Defendants had breached the Employment Agreement by not setting bonus criteria and not paying him annual bonuses. *Teague*, 2019 WL 3973372, at *6.  We pointed out that Plaintiff's "assumption that his demands demonstrate HDP's breach is based on the flawed premise that HDP alone was responsible for setting his bonus criteria." *Id*. at *7.  Under the Employment Agreement, the obligation to set bonus criteria fell on both Plaintiff and HDP's owners. *Id*. at *6.

Although Plaintiff argued that he had made several demands for Bryant to set bonus criteria, and Bryant admitted that neither he nor anyone else at HDP ever proposed bonus criteria, Defendants also argued that Plaintiff never proposed bonus criteria either. *Id*. at *7. Accordingly, there was a question of material fact as to whether Plaintiff had adequately performed regarding his effort to set forth bonus criteria. *Id*.

Defendants raise different issues in this round of briefing.  (*See* MSJ at 9–11.) Specifically, they contend that "[o]f the three periods for which Teague claims he is entitled to a bonus, there was only one annual period for which Teague was actually eligible to receive a bonus."  (MSJ at 9.)  The three periods are: (1) July 2015 through March 2016; (2) April 2016 through March 2017; and (3) April 2017 through October 13, 2017.  (*Id*.)

### a. July 2015 through March 2016

Defendants argue that Plaintiff is not entitled to a bonus for the period July 2015 through March 2016 because Section 7(c) of the Employment Agreement states that "[f]or performance in the year of 2015, the annual bonus will not be prorated." (MSJ at 9–10 (quoting Employment Agreement at 4).) According to Defendants, this demonstrates that the "parties specifically agreed that Teague would not even be eligible for a bonus" for the period July 2015 through March 2016. (MSJ at 10.)

Plaintiff has a different interpretation of the provision. He contends that he expected to receive an annual bonus of $29,000 per year (*i.e.* that the annual bonus would not be reduced for fiscal year 2015-2016, notwithstanding the fact that he had not worked for HDP for all of that fiscal year). (Resp. at 12.) He claims in that in April 2016, Defendants did not pay his bonus, but Bryant verbally promised to increase Plaintiff's bonus for fiscal year 2015-2016 to 40% of Plaintiff's salary if Plaintiff agreed to defer payment until two additional tasks were completed for the Winchester and Sierra Bloom projects. (*Id.* at 13; Pltf. SOF ¶ 23.) Plaintiff claims that he agreed to the verbal offer and expected to receive $58,000 once the two tasks were completed. (Pltf. SOF ¶¶ 24–25.)

Defendants have not denied that this conversation occurred. *Magee*, 2019 WL 10447014, at *3 ("If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted."). Instead, they claim that Plaintiff's statement is not credible because it is "contradicted by the allegations of the Complaint and the affidavit that Teague submitted in support of his motion for summary judgment." (Reply at 5.)

We are not permitted to weigh evidence or make credibility determinations at this stage. *See Saccameno*, 2018 WL 1240347, at *5. But even if we were, it is not clear to us how

23

Plaintiff's statement is contradicted by the Complaint or the statement submitted in connection with Plaintiff's prior motion for summary judgment. In Plaintiff's Complaint, he alleges that he was entitled to an annual bonus equivalent to 20% of his Base Salary and that, in April 2016, Bryant promised him a "Forty Percent (40%) annual bonus for the 2015-2016 fiscal year in the amount of Fifty-Eight Thousand Dollars ($58,000)." (Complaint ¶¶ 9–10.) Exhibit C to the Complaint—Plaintiff's October 6, 2017, letter to Bryant setting out his grievances—likewise sets forth a similar understanding concerning the bonus to be paid in April 2016 and the additional criteria that Plaintiff would have to meet to double his bonus. (Complaint, Ex. C.) Paragraphs 10 through 15 of the declaration that Plaintiff submitted in support of his motion for summary judgment convey similar information. (*See* Dkt. No. 48-8.)

Plaintiff's interpretation that he would receive $29,000 or "an annual bonus equivalent to 20%" of his annualized salary for fiscal year 2015-2016 is not inconsistent with the term indicating that his annual bonus for 2015 would "not be prorated." Black's Law Dictionary defines "prorate" as "[t]o divide or distribute proportionately; to assess ratably." Black's Law Dictionary (11th ed. 2019). Accordingly, the prohibition on proration suggests only that the bonus for 2015 would not be divided to account for only the months that Plaintiff had worked for HDP. Defendants have not done enough to convince us that there is no triable issue of fact as to Plaintiff's eligibility for a bonus for the period July 2015 through March 2016. For these reasons, we reject Defendants' argument as to this period.

### b. April 2016 through March 2017

Defendants acknowledge that Plaintiff was eligible for a bonus during this period; however, they claim that he was rightfully denied a bonus due to his poor performance and that his "bonus was subject to the determination of HDP's owners," per the terms of the Employment

24

Agreement. (MSJ at 10 (emphasis omitted).) Additionally, they argue that Plaintiff has not met his burden to show that he worked with HDP to set bonus criteria. (*Id.*)

Although Defendants have put forth some evidence to show that they acted in good faith when they did not pay Plaintiff a bonus for this period (*See, e.g.,* Def. SOF ¶¶ 13–23), Plaintiff has also put forth evidence suggesting the opposite. Among other things, he points out that after he sent Bryant a letter on October 6, 2017, in which complained about "the numerous breaches of [his] Employment Agreement," Bryant responded, "You just fucked your self [sic]," and terminated Plaintiff approximately one week later. (Pltf. SOF ¶¶ 66–69.) This exchange could suggest that Plaintiff may have been denied compensation in retaliation for his complaint, and not because of his performance. This an issue of material fact for a factfinder to decide.

We likewise reject Defendants' argument that summary judgment should be entered against Plaintiff because he failed to show that he worked with HDP to set bonus criteria. As we stated in our prior opinion, there is a genuine dispute of material fact as to whether Plaintiff met his contractual obligations. *See Teague*, 2019 WL 3973372, at *7. Plaintiff has put forth some evidence that he attempted to work with Defendants to determine bonus criteria. (*See* Pltf. SOF ¶¶ 10–12.) A factfinder must determine whether these efforts satisfied Plaintiff's obligations under the Employment Agreement. To the extent that they do not, the factfinder will also have to consider whether Plaintiff's nonperformance was excused because Defendants prevented him from performing. *See Teague*, 2019 WL 3973372, at *6 (observing that non-performance may be excused when prevented by the other party); *In re Edgewater Med. Ctr.*, 373 B.R. 845, 858 (Bankr. N.D. Ill. 2007).

### c. April 2017 through October 13, 2017

Defendants argue that the Employment Agreement precludes Plaintiff from receiving a bonus for the period April 2017 through October 13, 2017, because Plaintiff's employment with HDP ended on October 13, 2017, and "payment of the Annual Bonus is contingent upon Employee being employed by the Company on the date the Annual Bonus is paid." (MSJ at 10 (quoting Employment Agreement at 4).) According to Defendants, the applicable date for payment of the bonus for the period April 2017 through October 13, 2017, would be April 2018. (MSJ at 10.) There is no dispute that Plaintiff was not employed by HDP at that time; therefore, he would not have been entitled to a bonus for the period April 2017 through October 13, 2017. (*Id.*)

Plaintiff does not address this argument directly in his Response. (*See generally* Resp. at 12–13.) However, in his response to Defendants' statement of facts, he denies that Defendants interpreted the Employment Agreement correctly. (Pltf. Resp. Def. SOF ¶ 10.) Plaintiff acknowledges that payment of the bonus was contingent on him being employed by HDP on the date the Annual Bonus was paid. (*Id.*) However, he disputes that the bonus was to be paid in April of the year after a bonus was earned because the Employment Agreement states: "The Annual Bonus will be paid via lump-sum and incorporated into th Employee's first paycheck in the month of April each year." (*Id.* (emphasis omitted).)

If we analyze the provision relating to payment of the bonus as a whole, as we must,[15] it seems like payment of the annual bonus would necessarily have to occur in the year after the bonus was earned, and that Plaintiff would have to be employed by Defendants at that time to

---

[15] *See Teague*, 2019 WL 3973372, at *5 ("We must also construe the contract as a whole, viewing each part in light of others, and seek to give effect to each clause and word used, without rendering any terms meaningless.") (internal quotation marks and citations omitted).

qualify. For example, Section 7(c) of the Employment Agreement specifies that Plaintiff was eligible to receive a bonus "based on [his] performance," that the bonus would be "reasonably determined by the Owners," and that Plaintiff's "performance [would] be measured from April to March." (Employment Agreement at 4.) Taken together, these provisions suggest that HDP's Owners would determine whether Plaintiff was eligible for a bonus by looking back at his performance between April of the preceding year through March of the current year. If they determined that Plaintiff deserved a bonus, they would then compensate Plaintiff accordingly. Following this logic, it would seem that Plaintiff would not have been paid a bonus for April 2017 through October 2017 until April 2018.

In any event, we need not reach this issue because there is a more fundamental problem with Defendants' argument. A question of fact remains as to whether Defendants acted in bad faith when they terminated Plaintiff. (*See* Pltf. SOF ¶¶ 66–69.) If a factfinder concludes that Defendants acted in bad faith, then arguably, they prevented Plaintiff from satisfying the eligibility requirements for the bonus, and Plaintiff's nonperformance would be excused. *See Teague*, 2019 WL 3973372, at *6; *see also In re Edgewater Med. Ctr.*, 373 B.R. at 858. Accordingly, there is a triable issue of fact as to whether Plaintiff is entitled to a bonus for the period April 2017 through October 13, 2017.

### iv. Promoted Interest Compensation

Plaintiff has alleged that Defendants breached the Employment Agreement by not paying him a promoted interest in the Sierra Bloom and Winchester Projects. (Complaint ¶¶ 12–16, 24.) In our prior opinion, we explained that two conditions had to be met before Plaintiff could receive promoted interest compensation. *Teague*, 2019 WL 3973372, at *8. "First, HDP had to

be entitled to a promoted interest." *Id*. Second, Plaintiff "had to play a 'direct managerial' role" in that project. *Id*. (quoting Employment Agreement at 5).

We denied Plaintiff's prior motion for having failed to demonstrate that both elements were satisfied for both projects. *Teague*, 2019 WL 3973372, at *8. In the case of the Winchester Project, Plaintiff asserted that he had a managerial role, but there was no evidence that HDP had a promoted interest in the project. *Id*. In the case of the Sierra Bloom Project, there was evidence that HDP had a promoted interest but no evidence that Plaintiff had played a direct managerial role. *Id*.

This time around, Defendants argue that Plaintiff is not entitled to a promoted interest in either the Sierra Bloom or Winchester Projects because he has not had any role in either project for more than three years and never had a managerial role in the Sierra Bloom Project. (MSJ at 11.) Additionally, both Projects are "far from completion," and the realization of a promoted interest is speculative. (*Id*.) Defendants add that as a result of Plaintiff's "mismanagement of the Winchester project, HDP is embroiled in litigation with its anchor tenant and any potential for profit related to the project is extremely unlikely." (*Id*.)

The "Promoted Interest" provision states:

> The Parties acknowledge that the investment structure of certain projects pursued by the Company may contain a promoted interest as added incentive to the Company (the "Promote"). To the extent Employee provides a direct managerial role in projects where a Promote exists, Employee will receive a percentage of the Promote within the range of 10-35% as mutually determined by the Parties on a case-by-case basis, provided, however, that Employee's percentage of any Promote related to the Sierra Bloom campus in Phoenix, Arizona is anticipated to be within the range of 5-10% as mutually determined by the Parties.

(Employment Agreement at 4–5.) Although the provision requires that Plaintiff have a "direct managerial role in projects where a Promote exists" to receive a percentage of the Promote, it does

not specify whether Plaintiff must have that role for a certain amount of time or whether Plaintiff must be employed by HDP when HDP realizes the full value of the Promote. (*Id*.) Put another way, assuming that: (1) HDP's client agreed to give HDP a promoted interest in a particular project, (2) Plaintiff had a direct managerial role in that project while employed at HDP, and (3) Defendants agreed to give Plaintiff a certain percentage of their promoted interest in that project, Plaintiff might be entitled to a promoted interest even if he does not have a "direct managerial role" in the project and will not be employed by HDP when the final value of HDP's interest is determined. The provision neither requires that Plaintiff have a "direct managerial role" in a project for the entirety of the project, nor be employed by HDP when HDP actually earns money from the promoted interest to be entitled to a portion of that interest.

In the case of the Winchester Project, Plaintiff has put forth some evidence that he had a direct managerial role in the Project. *See, e.g., Teague*, 2019 WL 3973372, at *8. He has also put forth some evidence that Defendants agreed to give him a promoted interest in the Winchester Project. (*See, e.g.,* Pltf. SOF ¶¶ 29, 31–34.) Therefore, the only question is whether HDP, itself, had a promoted interest. As far as we can tell, Plaintiff has not provided additional facts in support of this point since the prior round of briefing. However, Defendants did not raise this issue in their opening brief either. (MSJ at 11–12.) Because Defendants did not move on this issue and only raise it in their Reply[16], the argument is waived. *See Eberhardt v. Brown*, 580 Fed. App'x 490, 491 (7th Cir. 2014) (observing that litigants waive arguments that they make for the first time in reply briefs); *Aparcedo v. Life Time Fitness, Inc.*, No. 16 C 1927, 2016 WL 5848955, at *2 (N.D. Ill. Oct. 6, 2016) (same).

---

[16] For example, Defendants write that Plaintiff "has simply assumed that HDP and/or Bryant owns one or more of the Projects but has not presented any evidence to support his assumption." (Reply at 7.)

Contrary to Defendants' assertion, we have never found that "there is no promote in relation to the Winchester Project." (Reply at 6.) We merely denied Plaintiff's prior motion for summary judgment because Plaintiff had not offered sufficient facts to meet his burden. *Teague*, 2019 WL 3973372, at *8. If Defendants had made the appropriate argument here, and Plaintiff had not offered evidence to rebut it, then we might have entered summary judgment against Plaintiff. Since we are not convinced by the arguments that Defendants raise here concerning the Winchester Project, summary judgment will not be entered against Plaintiff on that claim.

A similar analysis is appropriate for the Sierra Bloom Project. In the case of that project, Plaintiff has put forth some evidence that HDP had a promoted interest in the Project, and Defendants do not challenge that showing here. *See, e.g., id.*; (MSJ at 11–12.) Plaintiff also offered some evidence suggesting that Defendants agreed to give him a promoted interest in the Sierra Bloom Project. (*See, e.g.,* Employment Agreement at 5.) However, it is unclear whether Plaintiff can show that he played a "direct managerial role" in the Project. Defendants contend that he cannot. (MSJ at 11.) However, in their Statement of Facts, they admit that "[o]versight and development of [the Sierra Bloom and Winchester Projects] was a substantial portion of Teague's duties as a senior vice president of HDP." (Def. SOF ¶ 12.) They also blame Plaintiff's "continual delays and inattentiveness" for a client's decision to "terminate its development agreement at the Sierra Bloom campus." (*Id*. ¶ 27.) Taken together, these facts suggest that Plaintiff may have had a more significant role in the Sierra Bloom Project than Defendants acknowledged in their briefs. At the very least, it creates a triable issue of fact as to whether

Plaintiff can satisfy his claim to a promoted interest in the Sierra Bloom Project. For these reasons, summary judgment will not be entered against Plaintiff on this claim either.[17]

### v. Business Expenses

In our prior opinion, we advised Plaintiff that he had not met his initial burden as to this alleged breach. *Teague*, 2019 WL 3973372, at *8. Specifically, we advised Plaintiff that the "vague assertion" that he was owed funds was insufficient *Id*. Without more information, we could not determine "whether the expenses Teague claims of were 'reasonable,' actual business expenses, or that they were properly accounted for." *Id*.

Defendants did not move for summary judgment on this issue. (*See* MSJ at 5–12.) To the extent they mention Plaintiff's request for reimbursement, they do so in the context of Plaintiff's claim for fraudulent misrepresentation, not Plaintiff's claim for breach of contract. (*See* MSJ at 13–14.) The first time they address Plaintiff's request for reimbursement in the context of Plaintiff's breach of contract claim is in their Reply. (*See* Reply at 6.) Arguments made for the first time on reply are waived. *See Eberhardt v. Brown*, 580 Fed. App'x at 491; *Aparcedo*, 2016 WL 5848955, at *2. Accordingly, we will not enter summary judgment on this claim.[18]

---

[17] In Plaintiff's Statement of Additional Facts, he claims that Bryant promised him a 10% ownership stake in the Winchester Project and a 5% interest in the Sierra Bloom Project "in accordance with Sections 7, 8, and 9 of the Employment Agreement." (Pltf. SOF ¶ 29–30.) However, in his Complaint, he does not invoke Section 8 and only claims a right to a Promoted Interest under Section 9. (*See, e.g.,* Complaint ¶¶ 12–15.) Similarly, in his Response, he only advances arguments in connection with Sections 7(c) and Section 9. (*See* Resp. at 14–15.) Based on Plaintiff's submissions, we assume that Plaintiff is not seriously advancing a claim to an ownership interest in either the Winchester or Sierra Bloom Projects under Section 8 of the Employment Agreement. If he were, he would have to provide additional facts concerning an agreement to invest in equity ownership in one or both of the projects "on a pari passu basis." (*See* Employment Agreement at 4.)

[18] It does not appear as though Plaintiff has put forth additional facts to cure the deficiencies identified in our prior opinion. *See Teague*, 2019 WL 3973372, at *8. He cites the same exhibit in support of this claim as he did in the prior round of briefing. (*Compare* Dkt. No. 48-8, Ex. C

## B.  Count III (Fraudulent Misrepresentation)

Under Illinois law, a claim for fraudulent misrepresentation requires: (1) a false statement of material fact by a defendant, (2) made with the knowledge or belief that the statement is false, (3) with the intent to induce the plaintiff to act, (4) the plaintiff acting in reliance on the truth of the statement, and (5) the plaintiff suffering damages as a result of the reliance.  *See Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 496, 675 N.E.2d 584, 591 (Ill. 1996).

Plaintiff argues that he reasonably relied on the following false statements to his detriment:

- Bryant and HDP's promise of an annual bonus in the Employment Agreement;

- Bryant and HDP's promise to complete the criteria for Plaintiff's annual bonus together with Plaintiff during the calendar year 2015;

- Bryant and HDP's promise of incentive compensation in the form of percentages of project fees and "promoted interest";

- Bryant's April 2016 promise to double Plaintiff's annual bonus to $58,000 upon completion of the Winchester and Universal contingencies;

- Bryant's April 2016 promise to Plaintiff of 10% ownership interest in the Winchester project; and

- Bryant's May 2017 promise to Plaintiff of 5% ownership interest in the Sierra Bloom Project.

---

*with* Pltf. SOF, Ex. 1 at Ex. G.)  That exhibit, which purportedly "outline[s] each of Defendants' multiple contractual breaches and underpayments from December 2015 to October 2017" (Pltf. SOF ¶ 67), states only that Plaintiff has not been reimbursed for a car rental costing $557.58, which was incurred in July 2016; an office chair costing $589.99, which was purchased in October 2016; and "over $2,500 in 2017 expenses for the Winchester, VA project and general HDP business expenses."  (Dkt. No. 48-8, Ex. C; Pltf. SOF, Ex. 1 at Ex. G.)  We still cannot determine the nature of most of the claimed expenses, much less why those expenses were incurred or whether they were properly accounted for.

(Resp. at 15–16.)  Plaintiff argues that the above statements were made with the intent to convince Plaintiff to work for, and then to continue working for, HDP.  (*Id.* at 16.)  He further asserts that as a result of these statements, he lost wages, employment, and other business opportunities.  (*Id.*)

In response, Defendants argue that Plaintiff effectively repackaged his breach of contract claim as a claim for fraudulent misrepresentation.  (Reply at 8.)  According to Defendants, the only statements that Plaintiff alleges are fraudulent are the terms of the Employment Agreement, itself.  (*Id.*)  Further, Plaintiff has failed to present evidence that he was harmed by entering into the Employment Agreement, such as evidence of another job opportunity or investment that he chose not to pursue as a result of working for Defendants.  (*Id.*)

In Illinois, "a false representation of intent concerning future conduct, such as a promise to perform a contract when there is no actual intent to do so," is generally not actionable in tort unless it is part of a "'scheme' to defraud."  *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (internal citations omitted); *Katz v. Northwestern Orthopaedics and Sports Medicine Ltd.*, No. 18 CV 4515, 2020 WL 1986965, at *17 (N.D. Ill. Apr. 27, 2020) ("promises are not actionable for a fraud claim").[19]

"To invoke the scheme exception, the plaintiff must allege and then prove that, at the time the promise was made, the defendant did not intend to fulfill it."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012) (internal citation omitted).  "Such evidence would

---

[19] The cases cited in Plaintiff's Response apply the same standard.  *See Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) ("Promissory fraud is generally not actionable in Illinois, but there is an exception to this rule where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud.") (internal quotation marks and citations omitted); *Price v. Highland Community Bank*, 722 F. Supp. 454, 460 (N.D. Ill. 1989) ("While it is true that Illinois does not make fraudulent promising actionable as such, there is (as the jury was instructed) an exception if the promise is 'the scheme to accomplish a fraud.'")

include a 'pattern of fraudulent statements, or one particularly egregious fraudulent statement.'"
*Id*. (quoting *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F3d 131, 136 (7th Cir.
2011) (internal citations omitted)).  A pattern of fraudulent statements can include as few as two
two broken promises or a single false promise made to the public.  *See id*. at 570–71 (internal
citations omitted).

In this case, there can be no dispute that all of the alleged misrepresentations are promises
to act in the future, as opposed to statements of material fact.  The word "promise" appears in
each of the so-called "material false statements" (Resp. at 15–16), and none of the statements
convey facts that were subject to verification at the time they were made.

The question then becomes whether there is sufficient evidence in the record to support a
scheme to defraud.  Without this, it is clear that Plaintiff has not put forth sufficient evidence to
satisfy the first element of his claim.  In Plaintiff's Response, he does not explicitly state that
Defendants engaged in a scheme to defraud, though he does state that a series of promises were
made over time "with the intent to induce Plaintiff to accept employment with HDP, and then to
continue working for HDP."  (*See* Resp. at 16.)

Some of the alleged promises, such as the "promise" of an annual bonus in the
Employment Agreement, plainly cannot support Plaintiff's theory because there is no evidence
that such statements were made.  *See Teague*, 2019 WL 3973372, at *7 (concluding that the
Employment Agreement did not guarantee bonuses but made them discretionary).  However,
other of the purported promises, such as Bryant's April 2016 promise to double Plaintiff's annual
bonus to $58,000 upon completion of the Winchester and Universal contingencies, and Bryant's
oral promise to provide Plaintiff with a 10% ownership stake in the Winchester Project, have
some support in the record.  (*See* Pltf. SOF ¶¶ 23, 29.)

34

The bigger issue is that of intent. Plaintiff has not provided us with any evidence that Defendants did not intend to fulfill the above-referenced promises when they were made. At most, he provides facts to support the idea that Bryant made certain promises and failed to keep them. (*See generally* Pltf. SOF.) We need more. As Judge Posner once observed, "A change of mind can be...a breach of contract, but it is not fraud." *Price*, 722 F. Supp. at 460–61. The failure to create a triable issue of fact concerning Defendants' intent means that there is no triable issue of fact as to either the first or the second element of this claim. Without intent, there can be no scheme to defraud; and therefore, under Illinois law, no false statement of material fact.

Likewise, Plaintiff has not put forth enough facts to create a question of material fact that the above-referenced statements were were made with the knowledge or belief that they were false, as is necessary to satisfy the second element of a claim for fraudulent misrepresentation. Accordingly, judgment as a matter of law is appropriate. For these reasons, summary judgment is entered against Plaintiff on his claim for fraudulent misrepresentation.[20]

### C. Count IV (Illinois Wage Payment and Collection Act)

The Illinois Wage Payment and Collection Act ("IWPCA") "provide[s] employees with a cause of action for the timely and complete payment of earned wages or final compensation without retaliation from employers." *Degreer v. Gillis*, 707 F. Supp. 2d 784, 799 (N.D. Ill. 2010) (internal quotation marks and citation omitted). To state a claim under the IWPCA, a

---

[20] There is little evidence to support Plaintiff's claimed damages—particularly damages stemming from "lost employment and/or business opportunities elsewhere." However, at this stage, it is reasonable to infer that Plaintiff could have found employment elsewhere if he had not continued working for Defendants. *See Saccameno*, 2018 WL 1240347 at *6 (noting that even without documentary evidence of lost wages or other itemized damages, it was "entirely reasonable to infer that [plaintiff] lost income, and thus incurred actual damages, when she lost her job"). Accordingly, we are not persuaded by Defendants' argument that there is no triable issue of fact as to the fifth element of Plaintiff's claim for fraudulent misrepresentation.

plaintiff must show that he is owed wages or final compensation from an employer under an employment agreement. *Wharton v. Comcast Corp.*, 912 F. Supp. 2d 655, 658 (N.D. Ill. 2012).

Defendants argue that summary judgment should be entered against Plaintiff because HDP did not breach the Employment Agreement by improperly withholding Plaintiff's wages. (MSJ at 12.) As discussed above, there is an issue of fact as to whether Defendants properly withheld Plaintiff's wages. Thus, summary judgment will not be entered against Plaintiff at this time.

## IV. Conclusion

For the reasons set forth above, we grant, in part, both Defendants' request that we strike or disregard certain information (Dkt. No. 119) and Motion for Partial Summary Judgment (Dkt. No. 110). It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: March 1, 2021
      Chicago, Illinois